Robert A. Scher (RS 2910)
FRIEDMAN, WANG & BLEIBERG, P.C.
90 Park Avenue
New York, New York 10016
(212) 682-7474

John F. Birmingham, Jr.
Jeffrey S. Kopp
FOLEY & LARDNER LLP
150 W. Jefferson Ave., Suite 1000
Detroit, Michigan 48226
(313) 442-6487

Attorneys for Plaintiff Johnson Controls, Inc.


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X

JOHNSON CONTROLS, INC.,
a Wisconsin corporation,

        Plaintiff,

-vs-

A.P.T. CRITICAL SYSTEMS, INC., a
New York corporation, GLEN P.
NEVILLE, an individual, and
NICHOLAS M. MOON, an
individual,

        Defendants.

———————————————————————— X

04 Civ.4095 (PKL)
ECF Case
**VERIFIED COMPLAINT**


Plaintiff, Johnson Controls, Inc. ("JCI"), by its undersigned counsel, states as follows:

## INTRODUCTION

1.     This action involves claims for breach of non-competition/confidentiality agreements, breach of fiduciary duty, misappropriation of trade secrets, unfair competition, trade name infringement, trademark infringement, and dilution, arising under the laws of the United States, 15 U.S.C. §§ 1051-1127 ("Lanham Act"), and the laws of the State of New York, relating to the Defendant Moon and Neville's conduct during, and following, their employment with JCI.

## PARTIES

2.    Plaintiff, JCI, is a Wisconsin corporation, with its principal place of business in Milwaukee, Wisconsin.  JCI is engaged in the business of, among other things, the sale, installation, servicing, and operation of control systems for buildings.

3.    Defendant A.P.T. Critical Systems, Inc. is a New York corporation, with its principal place of business at 74 Gun Lane, Levittown, NY 11756.

4.    Defendant, Glen P. Neville ("Neville"), is a former executive of JCI who, upon information and belief, resides at 29 Fillat St., Staten Island, New York 10314.

5.    Defendant, Nicholas M. Moon ("Moon"), is a former executive of JCI who, upon information and belief, resides at 74 Gun Lane, Levittown, New York 11756.

## JURISDICTION AND VENUE

6.    Jurisdiction is proper in this Court, pursuant to 28 USC § 1332 [Diversity], as JCI is a Wisconsin corporation, with its principal place of business in Milwaukee, Wisconsin; Defendants are citizens of the State of New York; and the amount in controversy exceeds $75,000.00, exclusive of interest, costs and attorney fees.

7.    This Court also has jurisdiction over the subject matter and the parties under 15 U.S.C. § 1121 and 28 U.S.C. § 1331.

8.    Venue is proper under 28 U.S.C. § 1391 in the United States District Court for the Southern District of New York because a substantial part of the events giving rise to the claims set forth herein occurred in this judicial district.

## GENERAL ALLEGATIONS

9.     JCI has been a leader in the building controls industry since the Company was founded in 1885, by Professor Warren Johnson, the inventor of the electric thermostat.  Among other services, JCI engineers, manufactures, and installs building heating, ventilating, air conditioning, lighting, and fire safety equipment.

10.     JCI's integrated facilities management department also provides, among other services, on-site staff and management and consulting services to ensure the critical systems' operations of cooling, heating, electrical, and other systems providing back-up energy operations for banks and other financial institutions.

## JCI Purchases American Power Technologies, Inc.

11.     In approximately August 2000, JCI purchased a New York corporation called American Power Technologies, Inc. ("APT"), which was a competitor of JCI in the business of providing a broad range of consulting, study, maintenance, testing, and specialized field services for complex electrical power systems and related equipment, particularly systems and equipment serving critical loads in businesses and industries to which the quality and reliability of electrical service is extremely important.

12.     Defendants Neville and Moon were employed by APT before that company was purchased by JCI.

13.     After JCI purchased APT, to capitalize on its name recognition in the critical systems market in New York, JCI continued to operate American Power Technologies within the framework of JCI's critical systems division by continuing to use the distinctive name American Power Technologies, and its distinctive acronym, APT, with certain clients and by maintaining APT's telephone number.

## Moon's and Neville's Employment With JCI

14.     Defendant Neville was hired by JCI, and paid a signing bonus, in connection with the APT acquisition, on or about August 15, 2000.  From August 15, 2000 through February 27, 2004, Neville held the position of Director, Engineering for the JCI business unit called American Power Technologies, and Director I, Engineer Consulting Services for JCI's Integrated Facilities Management division.  As Director, Neville was the individual in charge of providing engineering and technical services for JCI's critical systems clients in New York and the tri-state area.  He was also responsible for soliciting new business and clients.

15.     Defendant Moon was hired by JCI on or about April 1, 2002.  From April 1, 2002 through March 5, 2004, as JCI's Critical Systems Manager, and the principal contact for various clients, Moon also provided engineering and technical services for JCI's clients in New York and the tri-state area.  He was also responsible for soliciting new business and clients.

16.     Moon and Neville were employed in the JCI business unit called American Power Technologies, where they were responsible for providing engineering and technical services regarding, among other things, critical electrical power distribution systems to clients primarily in the financial industry.  JCI enabled these executives to develop intimate knowledge of JCI's customer's requirements.

17.     Moon and Neville assumed a relationship of trust and confidence with JCI for which they received annual base salaries of $121,540 and $162,740, respectively, plus overtime pay, bonus pay, and stock options.  Neville also received a retention bonus of approximately $200,000 from JCI for continuing to work for JCI after JCI purchased APT.

18.     To protect its substantial investment in the purchase of APT, including confidential and proprietary information, and to maintain and develop customer goodwill, JCI

required Defendants to execute Employment Agreements with JCI.[1]

19.    On July 28, 2000, as a condition of his employment at JCI, Neville executed the

Employment Agreement (hereinafter the "Neville Agreement," attached hereto as **Exhibit A**).

Pursuant to the Neville Agreement, Neville agreed to the following:

**2.    CONFIDENTIALITY.**

For a period corresponding to the term of employment and for three years thereafter, as long as the information remains confidential or proprietary, I shall not disclose to others, copy or use, except as authorized by Johnson Controls, any confidential or proprietary information of Johnson Controls comprising any data or information, however embodied, acquired or created, concerning any aspect of the business of Johnson Controls that I may acquire or originate during my employment. This clause is not to be construed as prohibiting the use of my trade and professional skills so long as such use does not inevitably require disclosure or use of confidential or proprietary information of Johnson Controls. Further, this clause does not limit protection of any trade secrets of Johnson Controls that I may acquire or originate during my employment, which trade secrets I shall not disclose to others, copy or use for as long as the information remains entitled to trade secret protection under applicable statutory or common law.

Upon termination of my employment, I will surrender to Johnson Controls any and all documents that I have in my possession incorporating any such confidential or proprietary information, including all copies thereof whether in human or machine readable form.

**3.    NON COMPETITION.**

For one year following the date of termination I will not perform services directly or indirectly in or for a business competitive with Johnson Controls in the field of providing professional or technical engineering, design, or consulting services in connection with the design, installation, operation or maintenance of complex electrical power systems including those serving critical loads in commercial or industrial facilities, if such services will benefit or involve solicitation of: 1) existing Johnson Controls customers or potential customers served or solicited by me or someone under my supervision while I was a Johnson Controls employee, and/or 2) potential customers who within my last 12 months of employment received or were about to receive proposals from me or any employee of Johnson Controls under my supervision.

20.    On February 26, 2002, as a condition of his employment at JCI, Moon executed a

---

[1] The two agreements are substantially the same, except that Neville's agreement was made in consideration for the acquisition of APT and for the opportunity for him to earn a bonus in connection with that acquisition.

similar Agreement (hereinafter the "Moon Agreement," attached as **Exhibit B**), wherein he

agreed to, among other things, the same Confidentiality provision as set forth above, and the

following non-competition provision:

> **3.     NON-COMPETITION.**
>
> For one year following the date of termination I will not perform services
> directly or indirectly in or for a business competitive with Johnson Controls,
> with respect to; 1) existing Johnson Controls customers or potential customers
> served or solicited by me or someone under my supervision while I was a
> Johnson Controls employee, and/or 2) potential customers who within my last
> 9 months of employment received or were about to receive proposals from
> any employee of Johnson Controls with whom I had contact.  This covenant
> not to unfairly compete will not apply to contractors or subcontractors with
> whom Johnson Controls has existing or proposed business.

21.     While employed by JCI, among other things, Neville and Moon provided

engineering services in connection with the design, installation, maintenance, and testing of

electrical power distribution systems for significant Wall Street clients, including Deutsche

Bank, Merrill Lynch, Goldman Sachs, and others.  JCI placed Moon and Neville in a position

where they developed a relationship with each of these clients such that JCI could maintain a

presence in the client's operations and so that JCI could obtain additional business from these

clients.  Moon and Neville were JCI's primary contacts for these clients.

22.     These clients are and were very important to JCI and JCI designated Moon and

Neville as the key contact people for them.  Deutsche Bank, for instance, became a critically

important client to JCI in New York, generating monthly revenue of approximately $80,000.


## Confidential Information of JCI

23.     As high level executives in JCI's APT business unit, Neville and Moon received

and were responsible for using and generating a wide array of highly confidential business

6

information. This included detailed and current information about the financial aspects of JCI's business. It also included detailed information that JCI employees compiled concerning specific contracting opportunities with current and potential JCI customers.

24.      In their capacity as JCI executives, Moon and Neville had regular access, and were privy, to JCI's confidential, proprietary and trade secret business information. For example, Moon and Neville had regular access to documents and information regarding, among other things, JCI's customer base, new business presentations and/or proposals, business processes and summaries, profit margins, business revenues, *pricing strategies*, employee lists, sales and marketing information, training and operations material and memoranda, computer software and systems, financial information concerning or relating to JCI's business. Moon and Neville acknowledged their access to such information via the execution of their Employment Agreements which specifically provide for protection of such information.

## Moon and Neville Voluntarily Resign Their Employment

25.      On February 16, 2004, Neville voluntarily resigned his employment with JCI with an effective date of February 27, 2004.

26.      On February 18, 2004, Moon voluntarily resigned his employment with JCI with an effective date of February 27, 2004. His last date worked, however, was March 4, 2004.

## Moon's and Neville's Improper Activities

27.      Neville and Moon formed their own company, A.P.T. Critical Systems, Inc. ("A.P.T."), and Moon incorporated the business on March 2, 2004, while he was still a JCI employee.

28.      JCI has used and continues to use the distinctive names American Power

Technologies and APT to refer to its business unit which is the former American Power Technologies, Inc. business it purchased in August 2000.

29.    Upon information and belief, Defendants use the names American Power Technologies and/or A.P.T. to advertise and offer for sale its services in the tri-state area. Defendants' use of the name American Power Technologies, or its acronym "A.P.T." has caused actual confusion and also causes a likelihood of confusion with respect to JCI's APT division, deprives JCI of the full use and enjoyment of its lawful trademarks, dilutes the value of the trademarks and trade names, compromises the goodwill and reputation of JCI, reduces the potential market for JCI's own services, reduces consumer loyalty to JCI, and unjustly enriches Defendants.

30.    Based on the facts as set forth below, it is clear that Moon and Neville had been conspiring for several months to leave JCI and steal as many of its clients and business as they could.

31.    For example, in March 2004, JCI learned that Moon, in direct violation of his Agreement, was on site at an ongoing JCI project for Deutsche Bank at 60 Wall Street in New York City, performing the same or substantially similar work on behalf of his new company, A.P.T., that he had performed at JCI.  Deutsche Bank later informed JCI that Moon was going to continue managing the project with his new business and that JCI's services were no longer required.

32.    JCI also discovered that the week prior to his departure from JCI, Neville, without JCI's approval or consent, manipulated the cost structure of an ongoing Deutsche Bank project on JCI's computer system, changing the project from a time and material project to a fixed price project.  But for the fact that JCI discovered Neville's unauthorized actions and readjusted the

project pricing, the amount charged would have been approximately one quarter (1/4) of appropriate amount. In any event, services in connection with this project were assumed by Moon and his new company, A.P.T., the day after Moon departed JCI. JCI's estimated losses from this project are at least $160,000 in billings.

33.     In March 2004, JCI received an invitation from Merrill Lynch, a long-standing JCI client, to submit a proposal to perform a Thermographic Study at a Merrill Lynch facility in Jersey City, New Jersey. JCI submitted a proposal but was later told by Merrill Lynch that the project had been canceled. Upon information and belief, Moon, on behalf of A.P.T., had contact with Merrill Lynch and/or offered to provide these services, and was scheduled to be at the Merrill Lynch facility on the day the work with JCI was canceled.

34.     In March 2004, following Moon's resignation from JCI, JCI learned that Moon, on behalf of his new company, was providing consulting services for the uninterrupted power supply system maintenance for Goldman, Sachs, and Co., a long-time JCI customer. Moon was the primary contact for this account while at JCI.

35.     In May 2004, following Neville's resignation from JCI, Neville gave a training session to clients and prospective clients in which he identified himself as Glen Neville of American Power Technologies. The advertisement for this event was generated while Neville was employed at JCI.

36.     In March 2004, following Neville's resignation from JCI, Neville performed an investigation of an emergency power outage in the Datacenter of Goldman, Sachs and Co.'s facility located at 180 Maiden Lane, New York City.

37.     Defendants have made proposals to JCI's proposed and former clients that mirror

those of JCI's and were made with knowledge of JCI's prices and quotes. Because of the confidential information to which they were privy, Defendants have been able to undercut JCI's proposals. Indeed, in April 2004, Neville, on behalf of A.P.T., submitted a proposal to perform field engineering services for Silverstein Properties, Inc. at a building located at 650 West 42nd Street (River Place) in New York City. The fixed lump sum price for the Thermographic Study and spot measurements was $7,465. A.P.T. offered to complete Load Recordings for a fixed lump sum price of $3,340. (Exhibit C to the Affidavit of Kostas M. Pervolarakis) This was an approximate 10% reduction from a similar JCI proposal made one year earlier to the same JCI client. (**Exhibit E** to the Affidavit of Kostas M. Pervolarakis). [2]

38.    In April 2004, Moon, on behalf of A.P.T., visited another long-time JCI customer, Newsday, and was permitted access because he identified himself as "APT," and the customer believed, mistakenly, he represented JCI. When Newsday representatives discovered this actual confusion and that Moon was not with JCI, he was denied access to the facility.

39.    Following JCI's purchase of APT in August 2000, it maintained the telephone number previously used by APT and had telephone calls to that number forwarded to APT's new offices in Manhattan. A substantial number of calls were forwarded. Following the departures of Moon and Neville, JCI discovered that Neville, without any legitimate explanation, directed an administrative assistant to disconnect the phone number from the old APT number in Long Island that had been forwarded to the new JCI Manhattan number. Although the number was promptly reconnected, a number of clients raised concern over JCI's commitment to continue the APT business unit upon resignation of some of the top employees.

---

[2] This is one of a number of proposals that JCI submits to this client on an annual basis which results in over $150,000 in billings.

40.    On March 17, 2004, JCI wrote to Moon and Neville reminding them of their non-competition, confidentiality and other obligations under their Agreements and asking them to confirm their commitment to honor their obligations under the Agreement.  (See **Exhibit F** to the Affidavit of Kostas M. Pervolarakis)

41.    On or about April 15, 2004, counsel for Moon and Neville contacted Plaintiff's counsel, and offered only that the agreements signed by Moon and Neville might not be authentic because she did not have originals.  Defendants refused to cease their unlawful conduct, and their actions since receipt of the letter make it clear that they intend to continue to violate the Agreements.

42.    Upon information and belief, Moon and Neville have utilized JCI's confidential, proprietary and trade secret information in their solicitation of, and work at, Deutsche Bank, Goldman Sachs, and others, on behalf of their new employer, A.P.T.

43.    In their new employment, Moon and Neville have, and will, necessarily be called upon to use and disclose the confidential and proprietary information and materials they acquired at JCI because of their job duties and the immense value of the information they misappropriated.  Regardless, such use and disclosure are inevitable, as can be seen from their solicitations and work with their new employer.

44.    Moon and Neville have breached their Agreements with, and obligations to, JCI by virtue of their violations set forth in this Verified Complaint.

45.    Upon information and belief, Moon and Neville misappropriated JCI's trade secrets and solicited JCI's customers and misappropriated JCI's business opportunities and expectancies for their own benefit while still employed by JCI.  Upon information and belief,

based upon their use of information included in a proposal almost identical to a JCI proposal issued to the same customer the prior year, Defendants are in possession of JCI's confidential and proprietary information.

46.    Upon information and belief, Moon and Neville engaged in disloyal conduct in violation of their fiduciary and agency duties by manipulating existing contracts with JCI customers after they tendered their resignations to JCI, and by causing the APT telephone number to be disconnected.

47.    Moon and Neville have used the names "APT," "A.P.T." and "American Power Technologies" and have referred to themselves as having a relationship with American Power Technologies, knowing that the name is still used by JCI with many of its customers, who understand the term to refer to the entity purchased by JCI in August 2000, and that any representations of a relationship with the "American Power Technologies" or "APT" company operated by JCI are false.

## COUNT I
## BREACH OF CONTRACT
### (Against Neville and Moon)

48.    JCI realleges each and every allegation contained in paragraphs 1-47, inclusive, of this Complaint as though completely set forth herein.

49.    The Moon Agreement and the Neville Agreement are valid and enforceable contracts between Moon and Neville and JCI.

50.    JCI has fully performed its obligations under the Moon and Neville Agreements.

51.    Moon and Neville's actions as above described, including soliciting and servicing JCI customers and potential customers serviced or solicited by them while employed at JCI, and

using confidential information, constitute breaches of the terms of their respective employment agreements.

52.    Moon and Neville refused to honor their obligations under the Moon and Neville Agreements, and, by their conduct, have indicated that they have no intention of complying.

53.    As a proximate result of Moon and Neville's violations of their contractual obligations, JCI has been, and will continue to be, irreparably damaged and injured. JCI has no adequate remedy at law for Moon and Neville's actions since the damages JCI has suffered, and will continue to suffer, in connection with the divulgence of confidential information and trade secrets, by the loss of its competitive edge, customer goodwill, customers, and revenue.

54.    Moon and Neville will, unless restrained permanently, continue to violate JCI's rights, and Moon and Neville will continue to ignore their contractual duties to JCI by continuing to solicit and provide services for JCI customers.

55.    Accordingly, a permanent injunction restraining and enjoining Moon and Neville from continuing to violate the confidentiality and non-compete clauses in their employment agreements is the only remedy that will afford JCI meaningful immediate relief.

56.    To the extent that JCI can identify damages that it has suffered as a result of the loss of specific customers or revenue arising out of Moon's and Neville's breach of contract, JCI is entitled to recover those monetary damages and other relief set forth herein.

### COUNT II
### BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
(Against Moon and Neville)

57.    JCI realleges each and every allegation contained in paragraphs 1-56, inclusive, of this Complaint as though completely set forth herein.

58.     Moon and Neville were placed in a position of trust and confidence with JCI which gave rise to a fiduciary duty to refrain from diverting business opportunities away from JCI, and to refrain from misappropriating and using JCI's confidential information, trade secrets and goodwill for their own benefit.

59.     While still employed by JCI, Defendants Moon and Neville incorporated A.P.T. and, upon information and belief, made preparations and took action to steal JCI's clients.

60.     Moon's and Neville's actions in diverting JCI's business opportunities to their own benefit, and soliciting JCI's customers and prospects, performing work for JCI's customers, misappropriating JCI's confidential information, trade secrets and goodwill for their own benefit, directing that the old APT phone number be disconnected, and manipulating existing contracts with JCI customers for their own benefit, constitute breaches of Moon's and Neville's fiduciary duties and duties of loyalty to JCI.

61.     JCI has been damaged as a result of Moon and Neville's misconduct, including contacting JCI customers following their departure, passing themselves off as APT employees and using that name, and submitting proposals for new business based entirely on prior proposals made by JCI, changing JCI project terms, and manipulating JCI's telephone number, as well as causing the loss of JCI's competitive edge, customer goodwill, and fair competition.

62.     JCI's damages include, but are not limited to, the amount of all profits Moon and Neville and their business, A.P.T., wrongfully obtained and all revenue lost by JCI as a result of moon and Neville's breaches of fiduciary duty.

63.     Moon and Neville's continued use and disclosure of JCI's proprietary information and stealing of JCI's opportunities are inevitable given Moon and Neville's current employment.

64.     In addition to the above-referenced damages, JCI has no adequate remedy at law for the majority of its damages since the damages JCI has suffered, and will continue to suffer, in connection with the divulgence of confidential information and trade secrets, by the loss of its competitive edge, customer goodwill, customers, and revenue.

65.     Accordingly, a permanent injunction restraining and enjoining Moon and Neville from continuing this action is the only remedy that will afford JCI meaningful relief.

**COUNT III**
**MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION**
(Against All Defendants)

66.     JCI realleges each and every allegation contained in paragraphs 1-65, inclusive, of this Complaint as though completely set forth herein.

67.     As a result of their past employment relationship with JCI, Moon and Neville obtained JCI's valuable trade secrets and other proprietary information.

68.     Moon and Neville owe JCI a common law and contractual duty not to use or disclose confidential and proprietary information acquired in the course and scope of their JCI employment.

69.     Defendant A.P.T. knew or should have known that Moon and Neville obtained confidential and proprietary information at JCI and by hiring Moon and Neville in identical positions, are using to its  benefit JCI's confidential and proprietary information and trade secrets.

70.     Moon and Neville's possession and disclosure of JCI's customer lists and pricing information have resulted in an inequity.  Defendants are benefiting unjustly from the goodwill earned by American Power Technologies.  The Defendants have been further unjustly enriched

15

by using the names American Power Technologies and A.P.T. which has allowed them to step into the shoes of JCI, without having to spend the time, money and work performed by JCI to develop the property and relationships at issue.

71.    JCI has no adequate remedy at law for Moon and Neville's actions since the damages JCI has suffered, and will continue to suffer, in connection with the divulgence of confidential information and trade secrets, by the loss of its competitive edge, customer goodwill, customers, and revenue.

72.    Defendants' unauthorized use of Plaintiff's trade secrets and other proprietary confidential information has caused and continues to cause irreparable injury and damages to JCI.

73.    The damages to Plaintiff resulting from Defendants' misappropriation of its trade secrets and other proprietary confidential information will be difficult to quantify, and include, at a minimum, (i) the competitive advantages wrongfully imparted to A.P.T.; (ii) future lost sales and/or business opportunities; (iii) future lost profits; and (iv) loss or reputation, goodwill, and customer relationships.

## COUNT IV
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AND EXPECTANCIES
(Against All Defendants)

74.    JCI realleges each and every allegation contained in paragraphs 1-73, inclusive, of this Complaint as though completely set forth herein.

75.    JCI possesses, or possessed, a valid contractual relationship and/or business expectancy with its customers, including, but not limited to, Deutsche Bank and Merrill Lynch.

76.    Moon and Neville, and through them A.P.T., knew of JCI's business relationships

and expectancy with Deutsche Bank and Merrill Lynch, as well as other customers and prospects.

77.    Moon, Neville, and A.P.T. intentionally interfered with JCI's business relationships and expectancies with its customers and prospects, including, but not limited to, the Deutsche Bank and Merrill Lynch, by improperly inducing those customers and prospects to terminate the relationships and/or expectancies with JCI and by obtaining the work at least in part, through allowing one or more JCI customers to believe that they were still employed by the American Power Technologies entity purchased by JCI in August 2000.

78.    Moon's, Neville's, and A.P.T.'s actions were improper and unjustified in law because, inter alia, they were continuing a course of conduct set in motion while still employed by JCI, in breach of their fiduciary duties; their actions constitute a breach of their Employment Agreements; and they were using confidential information, trade secrets, and proprietary documents of JCI which they wrongfully misappropriated to further their tortious conduct.

79.    Moon's, Neville's, and A.P.T.'s improper and unjustified interference has resulted in, and if unrestrained, will continue to result in, injury to JCI in the form of lost customers and revenue and other damages.

80.    JCI has no adequate remedy at law for Moon's, Neville's, and APT's actions since the damages JCI has suffered, and will continue to suffer, in connection with the divulgence of confidential information and trade secrets, by the loss of its competitive edge, customer goodwill, customers, and revenue.

81.    By employing them to service and solicit JCI customers and prospective customers in violation of their employment agreements of which it is and was aware, Defendant

A.P.T. unlawfully interfered with the employment agreements between Moon and Neville and JCI.

82.    As a result of A.P.T.'s unlawful interference, JCI has been damaged in the form of lost employees, lost customers, lost revenue, lost goodwill, and other immeasurable and irreparable injuries caused by Defendants' tortious interference.

### COUNT V
### CIVIL CONSPIRACY
(Against All Defendants)

83.    JCI realleges each and every allegation contained in paragraphs 1-82, inclusive, of this Complaint as though completely set forth herein.

84.    Defendants' actions and conduct described above were a combination of two or more persons who, through concerted actions, accomplished an unlawful purpose and/or a lawful purpose through unlawful means.

85.    Defendants' actions and conduct described above amount to a civil conspiracy which has damaged JCI's business.

### COUNT VI
### TRADEMARK INFRINGEMENT
(Against All Defendants)

86.    JCI realleges each and every allegation contained in paragraphs 1-85, inclusive, of this Complaint as though completely set forth herein.

87.    Upon information and belief, notwithstanding JCI's well known and prior common law and statutory rights in the distinctive trademark and trade names American Power Technologies and "APT," Defendants incorporated and began using the names "A.P.T.", APT, and American Power Technologies.  Defendants' use of the names American Power

Technologies, A.P.T., and APT is likely to cause confusion, mistake, or deception, in that persons are likely to believe Defendants' services to be legitimately connected with, sponsored by, approved by, or warranted by JCI.

88.    Upon information and belief, Defendants' use of the trademarks and trade names "APT," A.P.T.," and American Power Technologies has caused actual confusion on the part of consumers over the source, sponsorship, approval, or affiliation of Defendants, and their products or services, with JCI.        Defendants' use of the trademarks and trade names "APT," A.P.T. and American Power Technologies has injured JCI's business reputation and diluted the distinctive quality of the marks and names American Power Technologies and "APT" as valid JCI trademarks and trade names, lessening the capacity of these  mark and names to identify and distinguish the services of JCI.

89.    Defendants' use of the trademarks and trade names "APT" A.P.T., and American Power Technologies has impaired JCI's ability to control its own reputation in the marketplace.

90.    Defendants' use of these marks and names will gravely and irreparably damage JCI unless restrained by this Court.  Because of the nature of the damages caused by Defendants' acts, JCI is without adequate remedy at law.

### COUNT VII
### UNFAIR COMPETITION
(Against All Defendants)

91.    JCI realleges each and every allegation contained in paragraphs 1-90, inclusive, of this Complaint as though completely set forth herein.

92.    Defendants' use of the marks and names "APT," A.P.T. and American Power Technologies constitutes willful unfair competition with JCI under 15 U.S.C. §1125 and the

statutory and common law of the several states, including the State of New York.

93.     Defendants' use of the marks and names "APT" A.P.T., and American Power Technologies in connection with its directly competitive services is has caused and is likely to cause confusion, mistake, and deception as to the origin or approval of Defendants' services, in violation of 15 U.S.C. § 1125.

94.     Defendants' use of these marks and names invites and enables Defendants to misrepresent their products and services as emanating from JCI and to substitute and pass off Defendants' products and services.

95.     Defendants' use of the mark and names "APT" A.P.T. and American Power Technologies gives their products and services a reputation and saleability to which they are not entitled and for which they would not otherwise have had and, accordingly, has unjustly enriched Defendants.

## RELIEF REQUESTED

WHEREFORE, JCI requests:

a.   That this Court issue a temporary restraining order and a preliminary and permanent injunction restraining and enjoining Moon and Neville;

    i.   from directly or indirectly soliciting or servicing JCI customers or potential customers who received or were about to receive a JCI proposal, as defined in the Agreements, for a period of one (1) year from the date of this Court's Order;

    ii.   from using or disclosing at any time in the future JCI's confidential business information, trade secrets, proprietary information or property;

    iii.   from interfering, in any way, with any current contract or prospective client relationship of JCI;

    iv.   from breaching any fiduciary obligation, including, but not limited to, using or disclosing JCI's confidential and proprietary information, appropriating any business opportunity of JCI, and engaging in deceptive acts or statements with regard to JCI's abilities, experiences, and/or personnel, to gain an unfair advantage in the critical systems industry;

    v.   from using in their business dealings or otherwise the names American Power Technologies, APT, or A.P.T. or any names causing a likelihood of confusion with JCI's marks and names APT and American Power Technologies.

b.   That this Court issue an injunction ordering Moon and Neville to return all JCI property to JCI, including all originals and copies of documents and computer memory containing trade secrets, proprietary, and confidential information, including, but not limited to: proposals made to customers, lists and addresses and phone numbers of all

21

JCI customers in their possession, strategic and business marketing plans, new business presentations and/or proposals, business processes and summaries, client lists, prospect lists, profit margins, business revenues, pricing strategies, competitive strengths and weaknesses, and employee lists, sales and marketing information, customer account records, training and operations material and memoranda, computer software and systems, personnel records, code books, financial information concerning or relating to the business, accounts and affairs of the company or its franchisees and licensees, among other information;

c.    That the Court order an accounting of all profits and revenue that Moon, Neville, and A.P.T., and all persons acting in concert with them, received or derived from the business dealings (1) with individuals or entities that were customers or potential customers of JCI; and (2) in which the services sold by Moon and Neville were related to their representation that they were affiliated with APT or American Power Technologies; and

d.    That JCI be granted as additional relief money damages, including exemplary damages, lost profits, all other appropriate damages, as well as all interest, costs and disbursements in this action, including attorney fees, and such other relief as this Court may deem just and proper in an amount to be determined at trial, but not less than $75,000; and

e.    That JCI be awarded monetary relief in an amount to be fixed by the Court in its discretion as just, including:

i.    all profits received by Defendants from sales and revenues of any kind made as a result of their infringing actions, said amount to be trebled; and

ii.    all damages sustained by Plaintiff as a result of Defendants' acts of

infringement and unfair competition, such damages to be trebled.

f.    That because of the exceptional nature of this case resulting from Defendants'

deliberate infringement actions, this Court award to Plaintiff all reasonable attorney's

fees, costs, and disbursements incurred as a result of this action, pursuant to 15 U.S.C.

§1117.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues triable to a jury.

DATE:    June 1, 2004

*Robert A. Scher*

Robert A. Scher (RS 2910)
Freidman, Wang & Bleiberg, P.C.
90 Park Avenue
New York, NY 10016
(212) 682-7474

John F. Birmingham, Jr.
Jeffrey S. Kopp
FOLEY & LARDNER LLP
150 W. Jefferson Ave., Suite 1000
Detroit, Michigan 48226
(313) 442-6487

Attorneys for Plaintiff Johnson Controls,
Inc.

## VERIFICATION

I, Kostas M. Pervolarakis, being first duly sworn, deposes and says that I am the Manager of

Branch 891 of Johnson Controls, Inc. Plaintiff, in the above-entitled cause, that I have read the

foregoing Verified Complaint and know its content, that to the best of my knowledge,

information and belief, the contents thereof are true.

**Johnson Controls, Inc.**

By: _____

Its: _____

Subscribed and sworn to before me this
/5ᵀᴴ day June, 2004.
/s/ _____
Notary Public, ___New York___County
My commission expires _9-17-05_ .
Dated: _6/1/04_____

ROBERT A. SCHER
Notary Public, State of New York
No. 02SC6064112
Qualified in Westchester County
Commission Expires September 17, 20_05_