Robert A. Scher (RS 2910)
FRIEDMAN, WANG & BLEIBERG, P.C.
90 Park Avenue
New York, New York 10016
(212) 682-7474

John F. Birmingham, Jr.
Jeffrey S. Kopp
FOLEY & LARDNER LLP
150 W. Jefferson Ave., Suite 1000
Detroit, Michigan 48226
(313) 442-6487

Attorneys for Plaintiff Johnson Controls, Inc.


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————————X

JOHNSON CONTROLS, INC.,
a Wisconsin corporation,                          04 Civ. _4095_

        Plaintiff,                                **ORDER TO SHOW CAUSE**

-vs-

A.P.T. CRITICAL SYSTEMS, INC., a
New York corporation, GLEN P.
NEVILLE, an individual, and
NICHOLAS M. MOON, an
individual,

        Defendants.
———————————————————————————X

*For the reasons stated on the record June 2, 2004*

Upon the Summons and Verified Complaint filed June 1, 2004, and upon the Affidavit of

Kostas M. Pervolarakis, sworn to on June 1, 2004, and the exhibits annexed thereto, and the

affidavit of Robert A. Scher, Esq., sworn to on June 1, 2004, and the accompanying

Memorandum of Law, and pursuant to Fed.R.Civ.P. 65; it is

        ORDERED that Defendants shall appear in the courtroom of the Honorable

*Peter K. Leisure* located at the U.S. Courthouse, Southern District of New York,

500 Pearl St., New York, NY on June _14_, 2004 to show cause why a preliminary

injunction should not be entered, restraining and enjoining Defendants:

i.    from directly or indirectly soliciting or servicing for a one year period (1) existing JCI customers served or solicited by Defendants Moon and Neville, or by another JCI employee under their supervision, or (2) potential JCI customers who within the last 12 and 9 months of Defendants Neville and Moon's employment, respectively, received or were about to receive proposals from Defendants or any JCI employee under their supervision;

ii.   from using or disclosing at any time in the future JCI's confidential business information, trade secrets, proprietary information or property as specifically set forth in the Employment Agreements of Moon and Neville and ordering Defendants to return all JCI property to JCI, including all originals and copies of documents and computer memory containing trade secrets, proprietary, and confidential information, including, but not limited to: proposals made to customers, lists and addresses and phone numbers of all JCI customers in their possession, strategic and business marketing plans, new business presentations and/or proposals, business processes and summaries, client lists, prospect lists, profit margins, business revenues, pricing strategies, competitive strengths and weaknesses, and employee lists, sales and marketing information, customer account records, training and operations material and memoranda, computer software and systems, personnel records, financial information concerning or relating to the business, accounts and affairs of the company, among other information;

iii.  from interfering, in any way, with any current contract or prospective client relationship of JCI;

iv.   from breaching any fiduciary obligation, including, but not limited to, using or disclosing JCI's confidential and proprietary information, appropriating any business opportunity of JCI, and engaging in deceptive acts or statements with regard to JCI's abilities, experiences, and/or personnel, to gain an unfair advantage in the critical systems industry; and

v.    from using the names American Power Technologies, APT, and A.P.T., in their business dealings.

ORDERED, that pending the determination of this Order to Show Cause, Defendants

are temporarily restrained:

i.    from directly or indirectly soliciting or servicing for a one year period (1) existing JCI customers served or solicited by Defendants Moon and Neville, or by another JCI employee under their supervision, or (2) potential JCI customers who within the last 12 and 9 months of Defendants Neville and Moon's employment,

respectively, received or were about to receive proposals from Defendants or any JCI employee under their supervision;

ii.     from using or disclosing at any time in the future JCI's confidential business information, trade secrets, proprietary information or property;

iii.    from interfering, in any way, with any current contract or prospective client relationship of JCI;

iv.     from breaching any fiduciary obligation, including, but not limited to, using or disclosing JCI's confidential and proprietary information, appropriating any business opportunity of JCI, and engaging in deceptive acts or statements with regard to JCI's abilities, experiences, and/or personnel, to gain an unfair advantage in the critical systems industry; and

v.      from using the name American Power Technologies, APT and A.P.T., in their business dealings.

ORDERED, that Plaintiff's counsel shall serve Defendants with this Order and all supporting papers on or before June _2_, 2004; and

ORDERED, that Defendants' answering papers on this motion shall be served upon Plaintiff's counsel so as to be received no later than _June 11_, 2004. at 1 ~5:00 p.m.~.

Dated:  New York, NY
        June _2_, 2004

_____
UNITED STATES DISTRICT JUDGE

Affidavit of
Robert A. Scher

Robert A. Scher (RS 2910)
FRIEDMAN, WANG & BLEIBERG, P.C.
90 Park Avenue
New York, New York 10016
(212) 682-7474

  - and-

John F. Birmingham, Jr.
Jeffrey S. Kopp
FOLEY & LARDNER LLP
150 W. Jefferson Ave., Suite 1000
Detroit, Michigan 48226
(313) 442-6487

Attorneys for Plaintiff Johnson Controls, Inc.


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------X

JOHNSON CONTROLS, INC.,
a Wisconsin corporation,

      Plaintiff,

-vs-

A.P.T. Critical Systems, Inc., a
New York corporation, GLEN P.
NEVILLE, an individual, and
NICHOLAS M. MOON, an
Individual,

      Defendants.

--------------------------------------------------X

04 Civ. _4095_

**AFFIDVIT OF ROBERT A.
SCHER, ESQ.**

STATE OF NEW YORK  )
                  ) ss.:
COUNTY OF NEW YORK  )


ROBERT A. SCHER, being duly sworn, deposes and says:

1.      I am a member of the law firm of Friedman, Wang & Bleiberg, P.C., co-counsel for plaintiff Johnson Controls, Inc. ("JCI") in this action. I make this affidavit in support of JCI's Order to Show Cause seeking a temporary restraining order and preliminary injunction

enjoining defendants from further breaching the Confidentiality and Non-Competition provisions of their Employment Agreements with JCI.  For the reasons set forth in the accompanying Affidavit of Kostas M. Pervolarakis, JCI's application is being brought by way of an Order to Show Cause because of the emergency nature of the application.

2.    No previous application for the relief sought, or for similar relief, has been made.

ROBERT A. SCHER, ESQ.

Sworn to before me this
1st day of June, 2004

Notary Public

DEBRA A. RYAN
Notary Public, State of New York
No. 01RY5077237
Qualified in Nassau County
Commission Expires May 5, 20 07

2

Robert A. Scher (RS 2910)
FRIEDMAN, WANG & BLEIBERG, P.C.
90 Park Avenue
New York, New York 10016
(212) 682-7474

John F. Birmingham, Jr.
Jeffrey S. Kopp
FOLEY & LARDNER LLP
150 W. Jefferson Ave., Suite 1000
Detroit, Michigan 48226
(313) 442-6487

Attorneys for Plaintiff Johnson Controls, Inc.


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————X

JOHNSON CONTROLS, INC.,                         04 Civ. _4095_
a Wisconsin corporation,

      Plaintiff,                                **AFFIDAVIT OF KOSTAS M.**
                                                          **PERVOLARAKIS**
-vs-

A.P.T. CRITICAL SYSTEMS, INC., a
New York corporation, GLEN P.
NEVILLE, an individual, and
NICHOLAS M. MOON, an
individual,

      Defendants.

——————————————————————X


    STATE OF NEW YORK    )
                      )   ss.:
    COUNTY OF NEW YORK  )


In support of Plaintiff Johnson Controls Inc.'s Application For Order to Show Cause, Kostas
M. Pervolarakis, being duly sworn, deposes and says:

    1.      I am the Manager of Branch 891 of Johnson Controls, Inc. ("JCI"), Plaintiff in the

above-entitled action.

    2.      I submit this affidavit in support of Plaintiff's Order to Show Cause seeking a

temporary restraining order and preliminary injunction. Attached hereto as **Exhibit A** is a copy

of the Complaint herein, verified by me as true.

3.       As set forth in detail below, Defendants Glen Neville and Nicholas Moon are

former key managers of JCI who: a)signed employment agreements with JCI containing limited,

reasonable, non-competition and confidentiality clauses; b)engaged in inappropriate activities at

JCI while preparing to compete against JCI; and c)after their resignations from JCI, in violation

of their employment agreements, repeatedly solicited and serviced JCI clients, for whom they

were the primary contact at JCI, using JCI confidential information and using the names APT

and American Power Technologies to confuse and mislead clients into believing they were

employed by the entity purchased by JCI in August 2000 for $4.3 million.

4.       JCI is not attempting by this application to prevent Neville and Moon from being

employed, or even competing directly with JCI. To the contrary, it is only seeking to enforce the

very narrowly drawn provisions of the non-compete and confidentiality provisions to which they

agreed which prohibit them from competing unfairly by utilizing confidential and proprietary

information obtained while employed by JCI, or by continuing to mislead the public into

believing that they remain employed by JCI.

5.       JCI has been a leader in the building controls industry since the company's

founding in 1885, by Professor Warren Johnson, the inventor of the electric thermostat. Among

other services, JCI engineers, manufactures, and installs building heating, ventilating, air

conditioning, lighting, and fire safety equipment.

6.       JCI's integrated facilities management department also provides, among other

services, on-site staff and management to ensure the critical systems' operations of cooling,

heating, electrical, and other systems that permit back-up energy operations for banks and other

financial institutions.

7.    In approximately August 2000, JCI purchased American Power Technologies, Inc. ("APT"), a New York Corporation which was a competitor of JCI that provided a broad range of consulting, study, maintenance, testing, and specialized field services for complex electrical power systems and related equipment, particularly systems and equipment serving critical loads in businesses and industries to which the quality and reliability of electrical service is extremely important.

8.    Neville and Moon were employed by American Power Technologies before that company was purchased by JCI.

9.    After JCI purchased APT, to capitalize on its name recognition in the critical systems market in New York, JCI continued to operate APT within the framework of JCI's critical systems division by using the name American Power Technologies, and its acronym, APT, with certain clients, and by maintaining APT's telephone number.

10.    In conjunction with the acquisition of APT, Neville was hired by JCI on or about August 15, 2000. From August 15, 2000 through February 27, 2004, Neville held the position of Director, Engineering for American Power Technologies and Director I, Engineer Consulting Services for Integrated Facilities Management. As Director, Neville was the individual in charge of providing engineering and technical services for JCI's critical systems' clients in New York and the tri-state area.

11.    Moon was hired by JCI on or about April 1, 2002. From April 1, 2002 through March 5, 2004, as Critical Systems Manager and the principal contact for various clients, Moon also provided engineering and technical services for JCI's clients in New York and the tri-state area.

12.    Moon and Neville were employed in JCI's critical systems division's American Power Technologies business unit, where they were responsible for providing engineering and technical services regarding, among other things, critical electrical power distribution systems to clients primarily in the financial industry. JCI's on-site managers obtain and develop intimate knowledge of the unique requirements for JCI customers.

13.    Moon and Neville assumed a relationship of trust and confidence with JCI for which they received annual base salaries of $121,540 and $162,740, respectively, plus overtime pay, bonus pay, and stock options. Neville also received a retention bonus of approximately $200,000 for continuing to work for JCI after JCI purchased American Power Technologies.

14.    Moon and Neville executed Employment Agreements with JCI (the "Agreements").

15.    On July 28, 2000, as a condition of his employment at JCI, Neville executed his employment agreement (the "Neville Agreement", attached hereto as **Exhibit B**), wherein he agreed to, among other commitments, the following:

### 2.    CONFIDENTIALITY.

For a period corresponding to the term of employment and for three years thereafter, as long as the information remains confidential or proprietary, I shall not disclose to others, copy or use, except as authorized by Johnson Controls, any confidential or proprietary information of Johnson Controls comprising any data or information, however embodied, acquired or created, concerning any aspect of the business of Johnson Controls that I may acquire or originate during my employment. This clause is not to be construed as prohibiting the use of my trade and professional skills so long as such use does not inevitably require disclosure or use of confidential or proprietary information of Johnson Controls. Further, this clause does not limit protection of any trade secrets of Johnson Controls that I may acquire or originate during my employment, which trade secrets I shall not disclose to others, copy or use for as long as the information remains entitled to trade secret protection under applicable statutory or common law.

Upon termination of my employment, I will surrender to Johnson Controls any and all documents that I have in my possession incorporating any such

4

confidential or proprietary information, including all copies thereof whether in human or machine readable form.

**3.    NON COMPETITION.**

For one year following the date of termination I will not perform services directly or indirectly in or for a business competitive with Johnson Controls in the field of providing professional or technical engineering, design, or consulting services in connection with the design, installation, operation or maintenance of complex electrical power systems including those serving critical loads in commercial or industrial facilities, if such services will benefit or involve solicitation of:  1) existing Johnson Controls customers or potential customers served or solicited by me or someone under my supervision while I was a Johnson Controls employee, and/or 2) potential customers who within my last 12 months of employment received or were about to receive proposals from me or any employee of Johnson Controls under my supervision.

16.    On February 26, 2002, as a condition of his employment at JCI, Moon executed a

similar employment agreement ("Moon Agreement", attached hereto as **Exhibit C**), wherein he

agreed to, among other things, the same Confidentiality provision as set forth above, and the

following non-competition provision:

**3.    NON-COMPETITION.**

For one year following the date of termination I will not perform services directly or indirectly in or for a business competitive with Johnson Controls, with respect to; 1) existing Johnson Controls customers or potential customers served or solicited by me or someone under my supervision while I was a Johnson Controls employee, and/or 2) potential customers who within my last 9 months of employment received or were about to receive proposals from any employee of Johnson Controls with whom I had contact. This covenant not to unfairly compete will not apply to contractors or subcontractors with whom Johnson Controls has existing or proposed business.

17.    While employed by JCI, among other responsibilities, Neville and Moon provided

engineering services in connection with the design, installation, maintenance, and testing of

electrical power distribution systems for significant Wall Street clients, including Deutsche

Bank, Merrill Lynch, Goldman Sachs, and others.  JCI placed Moon and Neville in unique

positions where they developed a relationship with each of these clients such that JCI could

maintain a presence in the client's operations and so that JCI could obtain additional business

from these clients. Moon and Neville were the primary contacts for these clients with respect to all sales and service issues.

18.    These clients are and were very important to JCI and JCI designated Moon and Neville as the key contact people for them. Deutsche Bank, for instance, became a critically important client to JCI in New York, generating revenues of approximately $80,000 per month.

19.    As the Director and the Manager of Critical Systems, Neville and Moon received, and were responsible for using and generating a wide array of highly confidential business information. This included detailed and current information about pricing and the financial aspects of JCI's business. It also included detailed information that JCI employees compiled concerning specific contracting opportunities with current and potential JCI customers.

20.    In their capacity as JCI executives, Moon and Neville had regular access, and were privy, to JCI's confidential, proprietary and trade secret business information. For example, Moon and Neville had regular access to documents and information regarding JCI's customer base, new business presentations and/or proposals, business processes and summaries, profit margins, business revenues, pricing strategies, employee lists, sales and marketing information, training and operations material and memoranda, computer software and systems, financial information concerning or relating to the business, among other information. Moon and Neville acknowledged their access to such information via the execution of their Agreements (**Exhibits B** and **C**), which specifically provide protection for such information.

21.    On February 16, 2004, Neville voluntarily resigned his employment with JCI with an effective date of February 27, 2004.

22.    On February 18, 2004, Moon voluntarily resigned his employment with JCI with an effective date of February 27, 2004. His last date worked, however, was March 4, 2004.

23.    Neville and Moon formed their own company, A.P.T. Critical Systems, Inc. ("A.P.T."), and Moon incorporated the business on March 2, 2004, while he was still a JCI employee.

24.    Prior to their departures, Moon and Neville engaged in inappropriate activity at JCI. For example, the week prior to his departure from JCI, Neville, without any legitimate explanation, changed the cost structure of an ongoing Deutsche Bank project from a time and material project to a fixed price project. As a result of Neville's unauthorized actions, the amount charged would have been approximately one quarter (1/4) of the actual amount, were it not discovered and corrected accordingly. Services in connection with this project were assumed by Moon and his new company, A.P.T., the day after Moon departed JCI.

25.    Additionally, before he left, and for no legitimate reason, Neville directed an administrative assistant to disconnect the phone number from the old APT number in Long Island that was being forwarded to the new JCI Manhattan number. Although the number was promptly reconnected, a number of clients raised concern over JCI's commitment to continue its APT business unit upon resignation of some of the top employees.

26.    Since Defendants Moon and Neville left JCI, at their new company Defendant A.P.T., they repeatedly have breached their Employment Agreements. Conduct violating their continuing obligations includes the following:

      a. Upon information and belief, Moon, in direct violation of his Agreement, has been on site at an ongoing JCI project for Deutsche Bank at 60 Wall Street in New York City, performing the same or substantially similar work on behalf of his new company, A.P.T., that he had performed at JCI. Deutsche Bank later informed JCI that Moon was going to continue managing the project with his new business and that JCI's services were no longer required.

7

b. In March 2004, JCI received an invitation from Merrill Lynch, a long-standing JCI client serviced by Moon and Neville, to submit a proposal to perform a Thermographic Study at a Merrill Lynch facility in Jersey City, New Jersey. JCI submitted a proposal but was later told by Merrill Lynch that the project had been canceled. Upon information and belief, Moon, on behalf of A.P.T., had contact with Merrill Lynch and/or offered to provide these services, and was scheduled to be at the Merrill Lynch facility on the day the work with JCI was canceled.

c. Since March 2004, following Moon's resignation from JCI, JCI has learned that Moon, on behalf of Defendant A.P.T. had been providing consulting services for the uninterrupted power supply system maintenance for Goldman, Sachs, and Co., a long-time JCI customer. Moon was the primary contact for this account while at JCI.

d. In May 2004, upon information and belief, Neville gave a training session to clients and potential clients in which he identified himself as Glen Neville of American Power Technologies. The advertisement for this event was generated while Neville was employed at JCI.

e. In March 2004, following Neville's resignation from JCI, upon information and belief, Neville performed an investigation of an emergency power outage in the Datacenter of Goldman, Sachs and Co's facility located at 180 Maiden Lane, New York City.

f. Defendants have made proposals that mirror those of JCI's and with knowledge of JCI's prices and quotes, they have the ability to undercut JCI's proposals. Indeed, in April 2004, Neville, on behalf of A.P.T., submitted a proposal to perform field engineering services for Silverstein Properties, Inc. at a building located at 650 West 42nd Street (River Place) in New York City. The fixed lump sum price for the Thermographic Study and spot measurements was

$7,465. A.P.T. offered to complete Load Recordings for a fixed lump sum price of $3,340. (**Exhibit D** hereto) This was an approximate 10% reduction from a similar JCI proposal made one year earlier to the same JCI client. (**Exhibit E** hereto). [1]

       g. In April 2004, Moon, upon information and belief, on behalf of A.P.T., visited another long-time JCI customer, Newsday, and was permitted access because he identified himself as "APT," and the customer believed he represented JCI. When Newsday representatives discovered that Moon was not with JCI, he was denied access to the facility.

27.    By letter dated March 17, 2004, JCI's counsel reminded Moon and Neville of their non-competition, confidentiality, and other obligations under their Agreements and asked them to confirm in writing that they would abide by such obligations (Letter attached hereto as **Exhibit F**). Defendants refused to comply and, as set forth herein, have continued to engage in prohibited activities, including the solicitation and service of JCI clients with whom they had contact at JCI, since receipt of the letter.

28.    JCI has suffered, and will suffer, irreparable harm if Defendants' activities continue. Moon and Neville will, unless restrained preliminarily and permanently, continue to violate JCI's rights, and will continue to ignore their contractual duties to JCI by soliciting and servicing JCI customers and potential customers. This matter is especially urgent because Defendants were the primary contacts for JCI with respect to the clients that Defendants are now soliciting. In addition, Plaintiffs are intimately familiar with JCI's pricing and other confidential information and have demonstrated that they will use such confidential information to steal additional JCI customers and business. Defendants' use of the names APT and American Power Technologies confuses and misleads JCI clients and is unfair. The resulting damage to JCI's

---

[1] This is one of a number of proposals that JCI submits to this client on an annual basis which results in over $150,000 in billings.

9

relationship with these customers, good will, and reputation is ongoing and impossible to

quantify.

Kostas M. Pervolarakis

Subscribed and sworn to before me this
1st day June, 2004.

/s/ *Robert A. Sch*
Notary Public, *New York* County
My commission expires *9-17-05*.

ROBERT A. SCHER
Notary Public, State of New York
No. 02SC6064112
Qualified in Westchester County
Commission Expires September 17, 20 05