Robert A. Scher (RS 2910)
FRIEDMAN, WANG & BLEIBERG, P.C.
90 Park Avenue
New York, New York 10016
(212) 682-7474

John F. Birmingham, Jr.
Jeffrey S. Kopp
FOLEY & LARDNER LLP
150 W. Jefferson Ave., Suite 1000
Detroit, Michigan 48226
(313) 442-6487

Attorneys for Plaintiff Johnson Controls, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

JOHNSON CONTROLS, INC.,
a Wisconsin corporation,                    04 Civ. _____4095_____

                Plaintiff,                  **MEMORANDUM OF LAW IN**
                                            **SUPPORT OF PLAINTIFF'S MOTION**
        vs.                                 **FOR TEMPORARY RESTRAINING**
                                            **ORDER AND PRELIMINARY**
                                            **INJUNCTION**

A.P.T. CRITICAL SYSTEMS, INC., a
New York corporation, GLEN P.
NEVILLE, an individual, and
NICHOLAS M. MOON, an
individual,
        Defendants.
_____X

# TABLE OF CONTENTS

Page(s)

I.    Introduction ……………………………………………………… 1

II.   Background Facts ………………………………………………… 3

    A.    JCI's Business …………………………………………… 3

    B.    JCI Purchases American Power Technologies, Inc ………………………… 3

    C.    Moon' and Neville's Employment With JCI ……………………………... 4

    D.    Confidential Information of JCI …………………………………………... 6

    E.    Moon and Neville Voluntarily Resign Their Employment ……………… 7

    F.    Moon's and Neville's Breaches Of Their Contractual Obligations
       And Other Improper Activities …………..………………………… 7

    G.    Plaintiff's Efforts To Stop Defendants' Conduct Have Been Unsuccessful 9

III.  Argument ………………………………………………………… 10

    A.    A Temporary Restraining Order And Preliminary Injunction Are
           Warranted……………………………………………… 10

    B.    JCI Satisfies The Standard For A TRO and Preliminary Injunction …… 11

        1.    JCI Will Suffer Irreparable Injury If Preliminary Injunctive Relief
            Is Not Granted …………………………………………… 12

        2.    JCI Will Prevail On The Merits Because Moon And Neville Have
            Violated Their Non-Compete and Confidentiality Agreements And
            Are Using JCI's Proprietary and Confidential Information …….... 14

        3.    The Harm To JCI If A Preliminary Injunction Is Denied Outweighs
            The Harm To Defendants If It Is Granted ………………………… 17

IV.   Conclusion ………………………………………………………… 19

# TABLE OF CONTROLLING AUTHORITIES

Page(s)

BDO Seidman v. Hirschberg, 93 NY2d 382, 712 N.E.2d 1220, 690 N.Y.S.2d 854 (1999)   12

Computer Associates Int'l v. Bryan, 784 F. Supp. 982 (E.D.N.Y. 1992)   12

Diamond Match Co. v. Roeber, 106 N.Y. 473, 482, 13 N.E. 419 (1887)   14

Doubleclick, Inc. v. Henderson, 1997 N.Y. Misc. Lexis 577
(N.Y. Supr. Ct. Nov. 5, 1997)   12

FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61 (2d Cir. 1984)   12

Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989)   10

Lumex, Inc. v. Highsmith, 919 F. Supp. 624 (E.D.N.Y. 1996)   12

Malarkey v. Texaco, Inc., 983 F.2d 1204 (2d Cir. 1993)   11

Maltby v Harlow Meyer Savage, Inc., 166 Misc.2d 481, 486, 633 N.Y.S.2d 926
(Supp. 1995), aff'd 223 A.D.2d 516, 637 N.Y.S.2d 110 (1st Dept 1996)   15

Natsource LLC v. Paribello, 151 F.Supp.2d 465 (S.D.N.Y. 2001)   11

Purchasing Assocs. v. Weitz, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600,
196 N.E.2d 245 (1963)   14

Reed, Roberts Assoc. v. Strauman, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677,
353 N.E.2d 590 (1976)   14

Ticor Title Ins. Co. v. Cohen, 173 F.3d 63 (2d Cir. 1999)   11

Webcraft Technologies, Inc. v. McCaw, 674 F. Supp. 1039 (S.D.N.Y. 1987)   11

Plaintiff Johnson Controls, Inc., ("JCI") submits this Memorandum of Law in Support of its motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a temporary restraining order and preliminarily injunction, enjoining Defendants Glen P. Neville, Nicholas M. Moon, and A.P.T. Critical Systems, Inc. ("A.P.T.") from soliciting or servicing customers or identifiable potential customers of Plaintiff in violation of Moon's and Neville's employment agreements, (2) from using and/or disclosing any of Plaintiff's trade secrets or confidential and/or proprietary information, and (3) from using the names "A.P.T.", "APT" and "American Power Technologies," which is a company owned and operated by Plaintiff.

## I. **INTRODUCTION**

This case involves two former key managers of JCI who (1) signed employment agreements with limited, valid, and enforceable non-competition and confidentiality clauses, (2) engaged in inappropriate activities that harmed JCI prior to resigning, and (3) repeatedly have solicited and serviced JCI clients for whom they were the primary contact at JCI. Plaintiffs have continued to blatantly violate their agreements after receiving a letter from JCI's counsel reiterating their obligations under the agreements, resulting in lost business and other serious and irreparable harm to JCI.

Furthermore, Defendants made proposals to JCI clients that utilize JCI's trade secrets, confidential and proprietary information in these efforts. As further evidence of the extent of Defendants' harmful conduct, Defendants are using the name "A.P.T.," "APT," and "American Power Technologies," which is the identical name of the company that JCI purchased in August 2000 for $4.3 million, and are representing to potential clients that they are related to that

1

company, when they are not.[1]

Defendants have committed numerous violations of their non-competition agreements, which require them to do the following:

>    (a)    For three years following the termination of their employment to maintain JCI's confidential information and not to disclose it to third parties;
>
>    (b)    To return all company property upon termination of employment;
>
>    (c)    For a period of one year, not to perform services, directly or indirectly in or for a business competitive with JCI in the field of providing professional or technical engineering, design, or consulting services in connection with the design, installation, operation or maintenance of complex electrical power systems including those serving critical loads in commercial or industrial facilities, if such services will benefit or involve solicitation of: 1) existing Johnson Controls customers or potential customers served or solicited by Defendants or someone under their supervision while they were Johnson Controls employees, and/or 2) potential customers who within their last [9 or 12] months of employment received or were about to receive proposals from them or any employee of Johnson Controls under their supervision.

The requirements for the issuance of a TRO and preliminary injunction are met as: (1) It is clear that Defendants are violating valid non-compete and confidentiality restrictions and that they will continue to do so without court intervention; (2) JCI has suffered irreparable injury which will be aggravated in the future unless Defendants are restrained; and (3) Defendants will suffer no prejudice or valid harm from the issuance of the relief requested as it involves only the cessation of future breaches of their contractual obligations and other improper activities. Plaintiff is not seeking an order that precludes Defendants from practicing their profession or even competing with JCI, but only asks that they honor their contractual, statutory, and common law obligations.

---

[1] Defendants previously worked for American Power Technologies, Inc. before accepting employment with JCI.

## II. **BACKGROUND FACTS**

### A. **JCI's Business**

JCI has been a leader in the building controls industry since the company was founded in 1885, by Professor Warren Johnson, the inventor of the electric thermostat. Among other services, JCI's engineers, manufactures, and installs building heating, ventilating, air conditioning, lighting, and fire safety equipment. (Affidavit of Kostas M. Pervolarakis, hereinafter "Pervolarakis Affidavit, ¶5").

JCI's integrated facilities management department also provides, among other services, on-site staff and management to ensure the critical systems' operations of cooling, heating, electrical, and other systems that permit back-up energy operations for banks and other financial institutions. (Pervolarakis Affidavit, ¶6)

### B. **JCI Purchases American Power Technologies, Inc.**

In approximately, August 2000, for $4.3 million, JCI purchased a New York corporation called American Power Technologies, Inc. ("APT"), which was a competitor of JCI in the business of providing a broad range of consulting, study, maintenance, testing, and specialized field services for complex electrical power systems and related equipment, particularly systems and equipment serving critical loads in businesses and industries to which the quality and reliability of electrical service is extremely important. (Pervolarakis Affidavit, ¶7) At the time of the purchase, Defendant Neville was APT's Manager Engineering and Maintenance Services and Defendant Moon was the Manager Critical Systems Services.

After JCI purchased APT, to capitalize on APT's name recognition in the critical systems market in New York, JCI continued to operate APT within the framework of JCI's critical systems division by continuing to use the distinctive names American Power Technologies and

3

APT with certain clients and by maintaining the telephone number for APT. (Pervolarakis Affidavit, ¶9)

## C.    Moon's and Neville's Employment With JCI

In conjunction with the purchase of APT, JCI hired Neville in August 2000 as its Director, Engineering for its American Power Technologies business unit, and Director I, Engineer Consulting Services for its Integrated Facilities Management Department. As Director, Neville was the individual in charge of providing engineering and technical services for JCI's critical systems' clients in New York and the tri-state area. He was also the executive in charge of the New York office. (Pervolarakis Affidavit, ¶10)

JCI hired Moon in April 2002, as Critical Systems Manager. As the principal contact for various clients, Moon also provided engineering and technical services for JCI's clients in New York and the tri-state area. (Pervolarakis Affidavit, ¶11)

Defendants Moon and Neville were employed in JCI's American Power Technologies business unit, where they were responsible for providing services in connection with the design, installation, maintenance and testing of electrical power distribution systems to clients primarily in the financial industry. (Pervolarakis Affidavit, ¶12) JCI placed Moon and Neville in a position where they developed a relationship with each of these clients such that JCI could maintain a presence in the client's operations and so that JCI could obtain additional business from these clients. This business unit does not employ sales representatives. Instead, Moon and Neville were the primary contact with customers and potential customers for both sales and services. (Pervolarakis Affidavit, ¶17) Moon and Neville assumed a relationship of trust and confidence with JCI for which they received annual base salaries of $121,540 and $162,740, respectively, plus bonuses, overtime, and stock options. (Pervolarakis Affidavit, ¶13)

4

To protect its substantial investment in the purchase of APT, including confidential and proprietary information, and to maintain and develop customer goodwill, JCI required Defendants, to execute Employment Agreements with JCI. (Pervolarakis Affidavit, ¶14).[2] In exchange for signing his agreement and for agreeing to work for JCI following the purchase, JCI paid Neville a generous retention bonus of $200,000. (Pervolarakis Affidavit, ¶13)

On July 28, 2000, as a condition of his employment at JCI, Neville executed an employment agreement (hereinafter the "Neville Agreement," attached as Ex. B to the Pervolarakis Affidavit), wherein he agreed to, among other commitments, the following:

2. **CONFIDENTIALITY.**

For a period corresponding to the term of employment and for three years thereafter, as long as the information remains confidential or proprietary, I shall not disclose to others, copy or use, except as authorized by Johnson Controls, any confidential or proprietary information of Johnson Controls comprising any data or information, however embodied, acquired or created, concerning any aspect of the business of Johnson Controls that I may acquire or originate during my employment. This clause is not to be construed as prohibiting the use of my trade and professional skills so long as such use does not inevitably require disclosure or use of confidential or proprietary information of Johnson Controls. Further, this clause does not limit protection of any trade secrets of Johnson Controls that I may acquire or originate during my employment, which trade secrets I shall not disclose to others, copy or use for as long as the information remains entitled to trade secret protection under applicable statutory or common law.

Upon termination of my employment, I will surrender to Johnson Controls any and all documents that I have in my possession incorporating any such confidential or proprietary information, including all copies thereof whether in human or machine readable form.

3. **NON COMPETITION.**

For <u>one year</u> following the date of termination I will not perform services directly or indirectly in or for a business competitive with Johnson Controls in the field of providing professional or technical engineering, design, or consulting services in connection with the design, installation, operation or maintenance of complex electrical power systems including those serving

---

[2] The two agreements are substantially the same, except that Neville's agreement was made in consideration for the acquisition of APT and for the opportunity for him to earn a bonus in connection with that acquisition.

critical loads in commercial or industrial facilities, if such services will benefit or involve solicitation of: 1) existing Johnson Controls customers or potential customers served or solicited by me or someone under my supervision while I was a Johnson Controls employee, and/or 2) potential customers who within my last 12 months of employment received or were about to receive proposals from me or any employee of Johnson Controls under my supervision.

On February 26, 2002, as a condition of his employment at JCI, Moon executed a similar Agreement (hereinafter the "Moon Agreement," attached as Exhibit C to the Pervolarakis Affidavit), wherein he agreed to, among other things, the same confidentiality provision as set forth above, and the following non-competition provision:

**3.    NON-COMPETITION.**

For <u>one year</u> following the date of termination I will not perform services directly or indirectly in or for a business competitive with Johnson Controls, with respect to; 1) existing Johnson Controls customers or potential customers served or solicited by me or someone under my supervision while I was a Johnson Controls employee, and/or 2) potential customers who within my last 9 months of employment received or were about to receive proposals from any employee of Johnson Controls with whom I had contact. This covenant not to unfairly compete will not apply to contractors or subcontractors with whom Johnson Controls has existing or proposed business.

These Agreements do not preclude Moon or Neville from earning a living or even from competing directly with JCI. It is instead narrowly tailored and limited to protect JCI's reasonable business interests.

JCI designated Moon and Neville as the key contact people for interacting with JCI clients. Deutsche Bank, for instance, became a critically important client to JCI in New York, generating revenues of approximately $80,000 per month. (Pervolarakis Affidavit, ¶18)

**D.    Confidential Information of JCI**

As the Director and the Manager of JCI's APT Critical Systems business unit, Neville and Moon received, and were responsible for using and generating a wide array of highly confidential business information. This included detailed and current information about pricing

6

and the financial aspects of JCI's business. It also included detailed information that JCI employees compiled concerning specific contracting opportunities with current and potential JCI customers. (Pervolarakis Affidavit, ¶19)

In their capacity as JCI executives, Moon and Neville had regular access, and were privy, to JCI's confidential, proprietary and trade secret business information. For example, Moon and Neville had regular access to documents and information regarding JCI's customer base, new business presentations and/or proposals, business processes and summaries, profit margins, business revenues, pricing strategies, employee lists, sales and marketing information, training and operations material and memoranda, computer software and systems, financial information concerning or relating to JCI's business, among other information. (Pervolarakis Affidavit, ¶20) Moon and Neville acknowledged their access to such information via the execution of their Agreements, which specifically provide for protection of such information. Id.

**E.    Moon and Neville Voluntarily Resign Their Employment**

On February 16, 2004, Neville voluntarily resigned his employment with JCI with an effective date of February 27, 2004. On February 18, 2004, Moon voluntarily resigned his employment with JCI with an effective date of February 27, 2004. His last date worked, however, was March 4, 2004. (Pervolarakis Affidavit, ¶¶21-22)

**F.    Moon's And Neville's Breaches Of Their Contractual Obligations And Other Improper Activities**

Neville and Moon formed their own company, A.P.T. Critical Systems, Inc. ("A.P.T."), and Moon incorporated the business on March 2, 2004, while he was still a JCI employee. (Pervolarakis Affidavit, ¶23) Upon information and belief, clearly attempting to capitalize on the goodwill of the company that JCI purchased for over 4 million dollars and to gain access to

7

customers through confusion, Defendants use the names A.P.T. and American Power

Technologies to advertise and offer for sale its services in the tri-state area.

Based on the facts which have recently been discovered, it is clear that Moon and Neville

had been conspiring to leave JCI and steal as many of its clients and business as they could.  For

example:

- Moon and Neville have been contacting JCI's customers for whom they were responsible while at JCI, including Jones Lang LaSalle, as agent for Deutsche Bank, and Deutsche Bank directly, resulting in JCI's loss of business from Deutsche Bank, costing JCI at least $80,000 per month. (Pervolarakis Affidavit, ¶26)

- JCI has discovered that the week prior to his departure from JCI, Neville, without any legitimate explanation, changed the cost structure of an ongoing Deutsche Bank project from a time and material project to a fixed price project.  As a result of Neville's unauthorized actions, the amount charged would have been approximately one quarter (1/4) of actual amount, were it not discovered and corrected accordingly.  Services in connection with this project were assumed by Moon and his new company, A.P.T., the day after Moon departed JCI. (Pervolarakis Affidavit, ¶24)

- In March 2004, JCI received an invitation from Merrill Lynch, a long-standing JCI client serviced by Moon and Neville, to submit a proposal to perform a Thermographic Study at a Merrill Lynch facility in Jersey City, New Jersey.  JCI submitted a proposal but was later told by Merrill Lynch that the project had been canceled.  Upon information and belief, Moon, on behalf of A.P.T., had contact with Merrill Lynch and/or offered to provide these services and was scheduled to be at the Merrill Lynch facility on the day the work with JCI was canceled. (Pervolarakis Affidavit, ¶26)

- Moon and Neville have been performing services for Goldman Sachs & Co., a long-time JCI client that they serviced at JCI, on behalf of their new company. (Pervolarakis Affidavit, ¶26)

- Defendants have made proposals that mirror those of JCI's and with knowledge of JCI's prices and quotes, have the ability to undercut JCI's proposals.  Indeed, in April 2004, Neville, on behalf of A.P.T., submitted a proposal to perform field engineering services for Silverstein Properties, Inc. at a building located at 650 West 42nd Street (River Place) in New York City.  The fixed lump sum price for the Thermographic Study and spot measurements was $7,465.  A.P.T. offered to complete Load Recordings for a fixed lump sum price of $3,340.  (**Exhibit D** to the Pervolarakis Affidavit)  This was an approximate

10% reduction from a similar JCI proposal made one year earlier to the same JCI client. (**Exhibit E** to the Pervolarakis Affidavit)[3]

- In May 2004, following Neville's resignation from JCI, Neville gave a training session to clients and potential clients in which he identified himself as Glen Neville of American Power Technologies. The advertisement for this event was generated while Neville was employed at JCI. (Pervolarakis Affidavit, ¶26)

- In April 2004, Moon contacted and visited Newsday, a long-time client of JCI, gaining entry by confusingly representing himself as "APT," and the customer believed he represented JCI. (Pervolarakis Affidavit, ¶26)

- Before he left JCI, and for no legitimate reason, Neville directed an administrative assistant to disconnect the phone number from the old APT number in Long Island that was being forwarded to the new JCI Manhattan number. Although the number was promptly reconnected, a number of clients raised concern over JCI's commitment to continue its APT business unit upon resignation of some of the top employees. (Pervolarakis Affidavit, ¶25)

## G.    Plaintiff's Efforts To Stop Defendants' Conduct Have Been Unsuccessful

By letter dated March 17, 2004, JCI's counsel wrote to Moon and Neville, reminding

them of their non-competition, confidentiality, and other obligations under their Agreements, and

asked them to confirm in writing that they would abide by such obligations. (**Exhibit F** to the

Pervolarakis Affidavit). On or about April 15, 2004, counsel for Defendants Moon and Neville

contacted Plaintiff's counsel, and disputed that the agreements signed by Moon and Neville were

authentic because she did not have originals. Defendants refused to cease their unlawful

conduct, and their actions since receipt of the letter make it clear that they intend to continue to

violate their employment agreements.

JCI has suffered, and will suffer, irreparable harm if Defendants' activities continue.

Moon and Neville will, unless restrained preliminarily and permanently, continue to violate JCI's

rights, and will continue to ignore their contractual duties to JCI by soliciting and servicing JCI

customers and potential customers. This matter is especially urgent because Defendants were the

---

[3] This is one of a number of proposals that JCI submits to this client on an annual basis which results in over

primary contacts for JCI with respect to the clients that Defendants are now soliciting. In addition, Plaintiffs are intimately familiar with JCI's pricing and other confidential information and have demonstrated that they will use such confidential information to steal additional JCI customers and business. Defendants' use of the names APT and American Power Technologies confuses and misleads JCI clients and is unfair. The resulting damage to JCI's relationship with these customers, good will, and reputation is ongoing and impossible to quantify.

As a result of Defendants' breach of contract and tortious conduct, JCI has been, and will continue to be, irreparably harmed. Thus, injunctive relief is warranted.

### III. ARGUMENT

A.    **A Temporary Restraining Order And Preliminary Injunction Are Warranted**

Pursuant to Federal Rule of Civil Procedure 65, an *ex parte* temporary restraining order may be granted where it appears that "immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition."[4] While state law applies to the substantive issues in this diversity action, federal law governs the standards for issuing a preliminary injunction. *See* Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 799 (3d Cir. 1989).

Defendants Moon and Neville conspired, while still employed by JCI, to create a company, through which they service and solicit clients that they serviced and solicited on behalf of JCI, in blatant derogation of their contractual obligations. Moon and Neville also had access to detailed and confidential information regarding pricing, margins, and JCI's customers. Once information such as this has been divulged, it cannot be retrieved. They have been warned about

---

$150,000 in billings.
[4] JCI's counsel informed Defendants' attorney on May 28, 2004 that it would be seeking the relief sought by

their violations of their non-competition and confidentiality obligations but instead of agreeing to voluntarily comply, they have continued to breach the agreement and engage in other improper activities. Unless immediately restrained by this Court's Temporary Restraining Order, Defendants will continue to carry out their wrongful plans and acts against JCI, thereby immediately and permanently causing JCI to suffer irreparable harm and injury. As such, JCI respectfully requests that this Court issue a Temporary Restraining Order as set forth in JCI's Order to Show Cause.

**B.       JCI Satisfies The Standard For A TRO and Preliminary Injunction.**

An injunction should be granted when the intervention of the court is essential to protect a party's rights against injuries that would otherwise be irremediable. Ticor Title Ins. Co. v. Cohen, 173 F.3d 63 (2d Cir. 1999). "The basic requirements to obtain injunctive relief have always been a showing of irreparable injury and the inadequacy of legal remedies." Id. at 68; Natsource LLC v. Paribello, 151 F.Supp.2d 465 (S.D. N.Y. 2001). An order involving injunctive relief will not be reversed unless it is an abuse of discretion or a clear error of law. Malarkey v. Texaco, Inc., 983 F.2d 1204, 1214 (2d Cir. 1993).

To be entitled to a preliminary injunction, the moving party must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardship tipping decidedly toward the party requesting the preliminary relief." Webcraft Technologies, Inc. v. McCaw, 674 F.Supp. 1039 (S.D.N.Y. 1987).

Both the Court of Appeals and district courts have issued preliminary injunctions to employers to prevent an ex-employee from using trade secrets on behalf of a competitor or to

---

application for a temporary restraining order on June 1, 2004.

prevent an employee from breaching a non-compete agreement. *See e.g.*, Ticor Title Ins. Co, *supra*, 173 F.3d 63; Webcraft Technologies, Inc., *supra*, 674 F. Supp. 1039; Lumex, Inc. v. Highsmith, 919 F. Supp. 624 (E.D. N.Y. 1996). JCI can successfully demonstrate that (1) it will be irreparably harmed by Defendants continued breaches of their employment agreements and by the Defendants' misappropriation of trade secrets and confidential information, (2) it has a likelihood of succeeding on the merits of its claims, and (3) that the harm to JCI outweighs any possible harm there might be to Defendants.

### 1. JCI Will Suffer Irreparable Injury If Preliminary Injunctive Relief Is Not Granted

JCI will suffer irreparable injury if a preliminary injunction is not granted. Irreparable harm is perhaps the most important requirement with respect to the granting of a preliminary injunction. Lumex, Inc. v. Highsmith, 919 F. Supp. 624 (E.D.N.Y. 1996).

The Second Circuit has held that it is generally not possible to calculate monetary damages if an employee violates a non-compete clause because "it would be difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would promote an indeterminate amount of business in years to come." Natsource, LLC, *supra*, 151 F.Supp.2d at 467; *see also* FMC Corp. v. Taiwan Tainan Giant Indus. Co., 730 F.2d 61, 63 (2d Cir. 1984); Doubleclick, Inc. v. Henderson, 1997 N.Y. Misc. Lexis 577 (N.Y. Supr. Ct. Nov. 5, 1997) (""Irreparable harm is presumed, where, as here, trade secrets have been misappropriated."); Computer Assocs. Int'l v. Bryan, 784 F.Supp. 982, 986 (E.D. N.Y. 1992) (same).

In BDO Seidman v. Hirschberg, 93 NY2d 382, 712 N.E.2d 1220, 690 N.Y.S.2d 854 (1999), the court enforced a restrictive covenant retraining the defendant from servicing the

plaintiff's clients from its Buffalo office for a period of 18 months following the termination of the defendant's employment. The court recognized the difficulty in establishing lost damages and held that the plaintiff demonstrated irreparable injury.

Similarly, in Webcraft Technologies, Inc., *supra*, 674 F. Supp. 1039, the district court granted a preliminary injunction against a former employee to prevent the former employee from disclosing confidential proprietary information of her former employer and from soliciting or servicing any of the employer's customers for a 2-year period. The court held that the employer established irreparable harm by showing that the defendant had passed pricing information to her new employer and solicited business from her own former customers and other customers of the plaintiff after she left her employment with the plaintiff.

Here, JCI will be irreparably harmed by Defendants' continued solicitation and servicing of JCI's clients, continued misleading use of the names American Power Technologies and APT, and continued misappropriation and use of confidential information. Unless prevented from doing so by this Court, Defendants Moon and Neville, and through them A.P.T., will continue to solicit and service JCI's clients and prospective clients that they were responsible for managing on behalf of JCI while at JCI. They will also use their knowledge of specific customers' needs and pricing information, to continue to misappropriate JCI's clients for the benefit of their new business, thereby inflicting even greater irreparable injury upon JCI.

JCI has suffered and will continue to suffer irreparable injury by virtue of Moon's and Neville's unique relationship with JCI clients that is a product of the position of trust as the primary client contact, in which JCI placed them. See Ticor Tit. Ins. Co., *supra*, 173 F.3d at 70 ("If the unique services of [an] employee are available to a competitor, the employer obviously suffers irreparable harm.") In this case, therefore, JCI has shown a real and eminent danger that

13

it will suffer "non-compensable injury" for which no measure of damages can be determined with any sufficient degree of certainty.

### 2.    JCI Will Prevail On The Merits Because Moon And Neville Have Violated Their Non-Compete and Confidentiality Agreements And Are Using JCI's Proprietary and Confidential Information

Under New York law, contracts in partial restraint of trade, such as non-compete agreements, if reasonable, are enforceable. *See* Diamond Match Co. v. Roeber, 106 N.Y. 473, 482, 13 N.E. 419 (1887); Lumex, *supra*, 919 F. Supp. at 628. New York courts will enforce non-compete agreements if they are reasonable in time and geographic scope and to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release or use of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique. *See* Purchasing Assocs. v. Weitz, 13 N.Y.2d 267, 272, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963); Reed, Roberts Assoc. v. Strauman, 40 NY.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976). The restraint at issue is much less restrictive than some that have been enforced as it allows Defendants to compete with JCI so long as they do not service or solicit current or identifiable future customers that they serviced or solicited, directly or indirectly at JCI, or use JCI confidential information.

New York courts have upheld non-compete agreements to protect an employer's interest in retaining customers where the employee's relationship with the customer is such that there is a substantial risk that the employee may be able to divert all or part of the business from the employer. In Ticor Title Ins. Co, *supra*, the court granted an injunction to enforce a 6-month non-compete agreement that prevented a former salesperson from working for a competitor, where his relationships with key customers were found to be unique. According to the court, the

inquiry focuses on the employee's relationship to the employer's business rather than on the individual skills of the employee. Thus, where the employee was the principal contact for various clients, and the business was largely dependent on personal relationships, the non-compete agreement was enforceable. Id. at 71. *See also* Maltby v Harlow Meyer Savage, Inc., 166 Misc.2d 481, 486, 633 N.Y.S.2d 926 (Sup. 1995), aff'd 223 A.D.2d 516, 637 N.Y.S.2d 110 (1st Dept 1996) (holding that several currency traders were unique employees because they had "unique relationships with the customers with whom they had been dealing," which were developed while they were employed and partially at the employer's expense.)

In Natsource LLC, *supra*, the court entered an injunction preventing a broker from servicing his former clients for a 90 day period as provided in a non-compete agreement he signed with the plaintiff. The court held that the broker's relationships with his clients and the skill and talents he developed were "unique" and protectable by use of a non-compete agreement. The court noted that the defendant's skill was "of such a level that it cannot be easily duplicated, and, if he were allowed to compete immediately against Natsource, the firm would be greatly harmed." Id. at 473. The court flatly rejected the defendant's argument that some of his clients were his clients before coming to work for the plaintiff, holding that the employer likely hired the defendant because of his access to clients, which was a reason for the plaintiff's use of a non-compete agreement. Id.

Here, as in Ticor Title Ins. and Natsource LLC, JCI seeks enforcement of the non-compete agreement to protect its legitimate interests. There is little doubt that the agreement is reasonable, as it is narrowly tailored to prevent Moon and Neville from competing unfairly against JCI for a one-year period in the specific field of providing professional or technical engineering, design, or consulting services in connection with the design, installation, operation

15

or maintenance of complex electrical power systems <u>and</u> if such services will benefit or involve solicitation of: 1) existing JCI customers or potential customers served or solicited by them or someone under their supervision while they were JCI employees, and/or 2) potential customers who within their last 9 or 12 months of employment, received or were about to receive proposals from them or any employee of JCI under their supervision. *See* Exhibits B and C to the Pervolarakis Affidavit.

Thus, the agreements are reasonable limited in time and geographical scope, where the agreement restricts Defendants <u>not</u> from earning a living, but from contacting specific JCI customers and prospective customers. *See* Harlan M. Blake, <u>Employee Agreements Not to Compete,</u> 73 Harv. L. Rev. 625, 681 (1960) (recognizing that "customer-defined" restrictions are more reasonable in most cases than those limited in strictly geographic terms); *see also* <u>BDO v. Hirshberg,</u> *supra* ("The employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." <u>Id</u>. at 392.)

Defendants have demonstrated, with specific factual examples, how Defendants have contacted no less than 5 JCI clients for which they had principal responsibility at JCI, made specific use of confidential JCI pricing to make a proposal to a JCI client on behalf of their new company, and are intimately familiar with the clients and contacts by virtue of the high level of interaction that they had with JCI clients. Moon and Neville were the principal contacts for the clients they are now seeking to divert from JCI. Indeed, Neville was in charge of the New York office and he reviewed and approved virtually all proposals and projects for JCI's clients. Neville and Moon are breaching legitimate, limited non-competition agreements that prohibit them from soliciting and servicing their former customers for a 12-month period. Accordingly,

16

the injunctive relief sought is appropriate to prevent Moon and Neville to continue soliciting or disclosing JCI's trade secrets and confidential information regarding the employer's customers, and because they should be prevented from exploiting JCI's goodwill. *See* BDO Seidman, *supra*, at 392.

JCI will also prevail on the merits where the facts demonstrate that the Defendants are using and disclosing JCI's trade secrets and confidential information. In Webcraft Technologies, *supra*, the court granted a preliminary injunction against a former employee who resigned to work for a competitor where the employer demonstrated that the departing employee misappropriated confidential information. The court specifically found that the injunction was necessary where the employee converted information which the former employer considered confidential, including the identity of customers, customer preferences and needs, and knowledge of its pricing and pricing methodology, which were all held to be confidential information.[5] Here, JCI will prove that Defendants have issued proposals that use JCI's confidential pricing information and will demonstrate that Defendants, by using the names American Power Technologies, APT, and A.P.T. are confusing and misleading customers into believing that they are still related to JCI. For these reasons, JCI will prevail on the merits of its claims.

### 3. **The Harm To JCI If A Preliminary Injunction Is Denied Outweighs The Harm To Defendants If It Is Granted**

Balancing the hardships is easy in this case. There will be no hardship to Defendants in enjoining them from the use of JCI's confidential information and usurping of its customer relationships. JCI is simply asking the Court to enjoin them from violating their contractual obligations and the law. The information possessed by Defendants and the relationships they

wish to exploit are not their own. They were never theirs. They are contractually bound not to solicit or provide services for JCI's clients and have a contractual obligation and a fiduciary obligation not to use JCI's confidential information in any way. If this Court grants Plaintiff's motion and issues a preliminary injunction, Moon and Neville will simply be enjoined from soliciting or servicing JCI's clients and identifiable potential clients for a period of one year, and from unfairly using the names APT and American Power Technologies to confuse clients and potential clients of JCI. Moon and Neville can operate their business and compete with JCI in New York and elsewhere, so long as they do not use confidential information or solicit or service JCI customers or potential customers that they served or solicited, directly or indirectly, while at JCI. It is beyond dispute that the harm they will suffer should this Court grant the injunction does not outweigh the harm that JCI will suffer should this court deny the injunction.

Potential and actual loss to JCI is monumental. First, JCI will suffer the loss of goodwill and, as discussed above, the loss of goodwill is immeasurable. Second, with the information in Defendants' hands and with Defendants admittedly competing directly with JCI in the marketplace, especially if permitted to continue to use the distinctive names American Power Technologies and "APT", JCI will unfairly lose its competitive edge. As stated, JCI has invested significant resources into the development of its clientele and relationships over the past several years. It is simply antithetical to the most fundamental notions of fair play that Defendants be allowed to usurp JCI's competitive position in direct violation of the reasonable contractual obligations to which they agreed.

Thus, the harm to JCI should this Court deny a preliminary injunction far outweighs the harm to Defendants should it be granted.

---

[5] Significantly, the court would have granted the injunction, irrespective of the non-compete agreement. Id. at 1047.

18

## IV. CONCLUSION

Based on the foregoing, JCI respectfully requests that this Court grant the relief requested in JCI's Verified Complaint and Order to Show Cause.

Respectfully submitted,

*Robert A. Scher*

Robert A. Scher (RS 2910)
Freidman, Wang & Bleiberg, P.C.
90 Park Avenue
New York, NY 10016
(212) 682-7474

John F. Birmingham, Jr.
Jeffrey S. Kopp
Foley & Lardner LLP
150 W. Jefferson Ave., Suite 1000
Detroit, Michigan 48226
(313) 442-6487

Attorneys for Plaintiff Johnson Controls, Inc.

Dated: June ⁄ , 2004