UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHNSON CONTROLS, INC.,

Plaintiff,

- against -

A.P.T. CRITICAL SYSTEMS, INC., GLEN P.
NEVILLE, and NICHOLAS M. MOON,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/24/04

**OPINION AND ORDER**

04 Civ. 4095 (PKL)


**APPEARANCES**


FRIEDMAN, WANG, & BLEIBERG, P.C.
90 Park Ave.
New York, New York 10016
Peter N. Wang, Esq.
Robert A. Scher, Esq.

FOLEY & LARDNER LLP
150 W. Jefferson Ave., Suite 1000
Detroit, Michigan 48226
John F. Birmingham, Jr., Esq.
Jeffrey S. Kopp, Esq.

Attorneys for Plaintiff


THE OTTINGER FIRM, P.C.
19 Fulton Street, Suite 400
New York, New York 10038
Robert W. Ottinger, Esq.

Attorney for Defendants

**LEISURE, <u>District Judge</u>:**

Plaintiff Johnson Controls, Inc. ("JCI") moves the Court, by way of an Order to Show Cause, for a preliminary injunction prohibiting defendants Glen P. Neville, Nicholas M. Moon and their company, A.P.T. Critical Systems, Inc. ("Critical Systems, Inc."), from engaging in certain business activities in violation of non-competition and confidentiality agreements that Neville and Moon entered into while employed by plaintiff. Plaintiff, a Wisconsin corporation, filed a Summons and Verified Complaint on June 1, 2004, alleging breach of contract, breach of fiduciary duty and breach of duty of loyalty by defendants Neville and Moon; as well as misappropriation of trade secrets and confidential information, tortious interference with business relationships and expectancies, civil conspiracy, trademark infringement and unfair competition by all defendants, who are citizens of New York. This Court's jurisdiction, which defendants have not challenged, is based on both diversity of citizenship and the questions of federal law raised by plaintiff's trademark and unfair competition claims.

On June 2, 2004, after holding a hearing attended by both parties, the Court issued a temporary restraining order pending resolution of plaintiff's motion for a preliminary injunction and ordered the parties to engage in expedited discovery. The temporary restraining order prohibited defendants from, *inter alia*, soliciting or servicing JCI's customers, using or disclosing JCI's proprietary or confidential information, interfering with JCI client relationships and using the name A.P.T. or American Power Technologies. On June 14 and 15, the Court held a full-blown evidentiary hearing, at which both sides presented live testimony and documentary evidence. On June 16, the Court extended the temporary restraining order for an additional 10 business days,

pending the Court's decision on the preliminary injunction.  For the reasons stated below, plaintiff's motion is granted in part and denied in part.  The preliminary injunction, as modified by the Court, will issue upon plaintiff's posting a bond in the amount of $350,000.

## BACKGROUND

Plaintiff JCI is an established company in what it refers to as the "building controls industry."  (Aff. of Kostas M. Pervolarakis, sworn to on June 1, 2004 ("Pervolarakis Aff.") ¶ 5.)  The company was founded in simpler times, back in 1885, by Professor Warren Johnson, the inventor of the electric thermostat.  (Id.)  Since then, it has grown into a much larger and complex operation that, among other services, engineers, manufactures and installs building heating, ventilating, air conditioning, lighting and fire safety equipment.  It also provides a variety of services related to the on-site maintenance and management of complex electrical systems, which enable large banks, financial institutions, and other clients to maintain an uninterruptible power supply for so-called critical loads—building and system functions for which the momentary loss of power could cause significant financial losses.  (Id. ¶¶ 6-7.)  These systems are of particular importance in the financial industry, where dependable power is the *sine qua non* of real-time worldwide capital markets.

In approximately August of 2000, plaintiff JCI purchased American Power Technologies, Inc. ("APT"), a New York company that had competed with JCI in providing engineering, consulting and maintenance services for complex electrical systems.  In particular, APT focused on providing such services for businesses and industries that required uninterruptible power for critical loads, an area loosely referred to

by the parties as the "critical systems" industry.  (Id. ¶¶ 6-7.)  At the time of the purchase,

APT was well known in the building controls industry and considered a "premiere

provider" of general engineering services for office buildings.   (June 14-15, 2004 Hr'g

Tr. ("Tr.") at 97.)  After the purchase, JCI continued to operate APT's business within its

existing critical systems division; it continued to use the name American Power

Technologies and the acronym APT with certain clients and it maintained APT's former

phone number so that calls to the number would be forwarded to JCI.  JCI also hired

numerous former APT employees as well as APT's former president and owner, Clifton

LaPlatney.

   Prior to the purchase, defendants Neville and Moon were managers with APT

involved in the service of critical systems clients.  (Tr. at 36, 71, 95-96.)  In conjunction

with the acquisition of APT, Neville was hired by JCI immediately in August of 2000 and

remained employed there through February 27, 2004.  While at JCI, Neville's

responsibilities included overseeing engineering and technical services for JCI's critical

systems clients, as well as, for a time, managing its New York office. (Pervolarakas Aff.

¶ 10; Tr. at 108.)  Moon, on the other hand, left APT when it was acquired by JCI and

spent two years in Spain, managing the Madrid office of a company called ICW Power.

(Tr. at 71.)  He later returned to the United States and was hired by JCI in approximately

April of 2002, as an engineering manager.  (Tr. 72, 237.)  In this position, Moon oversaw

a number of engineers who performed critical systems services including, but not limited

to, the maintenance and testing of uninterruptible power supply ("UPS") systems.  (Tr. at

237.)  Both Neville and Moon were placed in positions where they were responsible for

developing and maintaining relationships with JCI's clients through client contact,

submitting proposals for work projects, and supervising engineering work on projects that JCI performed. (Pervolarakas Aff. ¶¶ 17-18; Tr. at 36, 78-79; 108; 237-38, 282-83.) For their services, Neville and Moon received substantial compensation, in the form of salaries, overtime payments, bonuses and stock options. (Pervolarakas Aff. ¶ 13.)

As a condition of their employment with JCI, defendants Neville and Moon executed employment agreements that included, among other things, confidentiality and non-competition clauses. The confidentiality provisions for both defendants' agreements is as follows:

> **CONFIDENTIALITY**
> For a period corresponding to the term of employment and for three years thereafter, as long as the information remains confidential or proprietary, I shall not disclose to others, copy or use, except as authorized by Johnson Controls, any confidential or proprietary information of Johnson Controls comprising any data or information, however embodied, acquired or created, concerning any aspect of the business of Johnson Controls that I may acquire or originate during my employment. This clause is not to be construed as prohibiting the use of my trade and professional skills so long as such use does not inevitably require disclosure or use of confidential or proprietary information of Johnson Controls. Further, this clause does not limit protection of any trade secrets of Johnson Controls that I may acquire or originate during my employment, which trade secrets I shall not disclose to others, copy or use for as long as the information remains entitled to trade secret protection under applicable statutory or common law.

(June 14-15, 2004 Hr'g Pl.'s Ex. ("Pl.'s Hr'g. Ex.") 1, 3-4.)

The employment agreement that the parties agree applies to defendant Neville for the purposes of the instant motion contains the following non-competition provision:

> **NON COMPETITION**
> For one year following the date of termination I will not perform services directly or indirectly in or for a business competitive with Johnson Controls, with respect to 1) existing Johnson Controls customers or potential customers served or solicited by me or someone under my supervision while I was a Johnson Controls employee, and/or 2) potential customers who within my last 9 months of employment received or were

about to receive proposals from any employee of Johnson Controls with
whom I had contact.  This covenant will not apply in the event that any
prospective employer whose business is competitive with Johnson
Controls has an existing revenue generating relationship with a Johnson
Controls customer or potential customer.

(Pl.'s Hr'g Ex. 1.)[1]  Defendant Moon's non-compete clause reads:

For one year following the date of termination I will not perform services
directly or indirectly in or for a business competitive with Johnson
Controls with respect to: 1) existing Johnson Controls customers or
potential customers served or solicited by me or someone under my
supervision while I was a Johnson Controls employee, and/or 2) potential
customers who within my last 9 months of employment received or were
about to receive proposals from me or any employee of Johnson Controls
with whom I had contact.  This covenant not to unfairly compete will not
apply to contractors or subcontractors with whom Johnson Controls has
existing or proposed business.

(Pl.'s Hr'g Ex. 4.)

At some point in the fall of 2003, however, the relationship between defendants

Neville and Moon and their new employer began to sour.  Both Moon and Neville

tendered their resignations to JCI in late February 2004, and by early March 2003, were

doing business under the name A.P.T. Critical Systems, Inc.  Plaintiff claims that Neville

and Moon have wrongfully held themselves out for business using the names A.P.T. and

American Power Technologies; have wrongfully interfered with existing JCI service

contracts; have offered and, in fact, provided competing services to JCI clients that the

defendants serviced while employed by JCI; and have attempted to undercut JCI's service

proposals with competing bids relying on their knowledge of JCI's confidential

information.  Plaintiff contends that defendants' positions at JCI involved substantial

---

[1] Plaintiff initially submitted an earlier employment agreement signed by Neville in
support of its motion.  Most notably, the earlier agreement did not contain the last
sentence that appears in the non-competition clause above.  By stipulation of the parties,
the Court will determine the instant motion based on the language in the later agreement.

client contact and responsibility for building client relationships as well as access to a wide array of confidential business information and trade secrets including JCI pricing, business proposals, the identities of JCI's customers and information about customer needs. JCI claims that defendants' attempts to siphon off its customers and misappropriate its trade secrets and confidential information will cause it irreparable harm absent injunctive relief and, furthermore, that it is entitled to such relief because Neville and Moon have violated enforceable non-compete and confidentiality agreements and misappropriated protectable information.

Plaintiff seeks a broad preliminary injunction, enjoining defendants 1) from soliciting or servicing existing or potential JCI clients who were solicited or served by defendants Moon and Neville or their subordinates at JCI; 2) from using or disclosing JCI's confidential information and trade secrets and ordering Moon and Neville to return such information to JCI; 3) from interfering, in any way, with current or prospective client relationships of JCI; and 4) from breaching their fiduciary obligations to JCI. Initially, JCI also sought to enjoin Moon and Neville from using the name American Power Technologies, or the acronyms APT and A.P.T., in their business dealings. In their Opposition to plaintiff's motion and at the June 14-15 hearing, however, defendants indicated that they had changed the name of their company to "Critical Systems, Inc." by filing an amendment with the New York State Department of State, Division of Corporations, and that they would no longer use the name A.P.T. Critical Systems. Based on this representation, JCI has withdrawn its request for an injunctive relief on this issue.

Neville and Moon do not deny that they developed and maintained important client relationships while they were employed by JCI. Nor do they deny that since they left JCI, they have been soliciting and servicing these clients to JCI's detriment. Instead, they argue that these relationships were personal client relationships that they developed over many years in the critical systems industry. In addition, they assert that none of the information they obtained while employed by JCI rises to the level of a trade secret or protectable confidential information. Accordingly, they contend that the non-compete clauses in their employment agreements do not protect any legitimate interest of JCI and are unenforceable.

Even if the clauses are enforceable, defendants argue that Neville's non-compete provision does not preclude Neville from servicing any JCI clients if he accepts employment with an employer, which, at the time of his employment, already has an existing revenue generating relationship with at least one JCI client. Defendants argue that because Moon had already set up Critical Systems, Inc. and serviced its first JCI client prior to Neville's arrival at the new company, Neville is not in violation of his agreement. As for Moon, defendants argue that his non-compete clause is unclear and appears to allow him to service contractors and subcontractors that are clients of JCI. Because most of JCI's clients are third parties contracted by large financial institutions to manage their building facilities, defendants argue that the clause is so limited as to be meaningless. As a result, defendants maintain that preliminary injunctive relief is inappropriate in this case.

## DISCUSSION

It is well established that in order to obtain a preliminary injunction, the movant must show: (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. See, e.g., Sweeney v. Bane, 996 F.2d 1384, 1388 (2d Cir. 1993); Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). Whether injunctive relief should issue or not "'rests in the sound discretion of the district court which, absent abuse of discretion, will not be disturbed on appeal.'" Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990) (quoting Thornburgh v. American Coll. of Obstetricians and Gynecologists, 476 U.S. 747, 755 (1986)).

### A.    Irreparable Harm

Irreparable harm is "'the single most important prerequisite for the issuance of a preliminary injunction.'" Reuters, 903 F.2d at 907 (quoting Bell & Howell: Mamiya Co. v. Masel Co. Corp., 719 F.2d 42, 45 (2d Cir. 1983)). Irreparable harm is an "injury for which a monetary award cannot be adequate compensation." Javaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) (citing Jackson Dairy, 596 F.2d at 72). Further, "[i]rreparable harm must be shown by the moving party to be imminent, not remote or speculative." Reuters, 903 F.2d at 907 (citing Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 972 (2d Cir. 1989)). The movant is required to establish not a mere *possibility* of irreparable harm, but that it is *likely* to suffer irreparable harm if equitable relief is denied." JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990) (emphasis in original). "Likelihood sets, of course, a higher standard than 'possibility.'" Id.

Generally, when a party violates a non-compete clause, the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm. As the Second Circuit recently explained, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69-70 (2d Cir. 1999); see also Shred-It USA, Inc. v. Mobile Data Shred, Inc., 202 F. Supp. 2d 228, 233 (S.D.N.Y. 2002); Unisource Worldwide, Inc. v. Valenti, 196 F. Supp. 2d 269, 280 (S.D.N.Y. 2002); Natsource LLC v. Paribello, 151 F. Supp. 2d 465, 469 (S.D.N.Y. 2001); Garber Bros., Inc. v. Evlek, 122 F. Supp. 2d 375, 384 n.6 (E.D.N.Y. 2000); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn, 73 F. Supp. 2d 425, 428 (S.D.N.Y. 1999); Velo-Blind, Inc. v. Schek, 485 F. Supp. 102, 109 (S.D.N.Y. 1979) ("By siphoning off plaintiff's carefully gleaned customers, defendants subject plaintiff to a definite possibility of irreparable harm, which increases as long as it continues unrestrained.  What is at stake here is plaintiff's good will built up over the years, which is not, contrary to defendant's assertion, monetarily ascertainable.").  Under limited circumstances, such as where the loss to an employer can be quantified in terms of a specific amount of lost sales, no irreparable harm is threatened.  See Production Resource Group, LLC, v. Oberman, No. 03 Civ. 5366 (JGK), 2003 WL 22350939 at *7 (S.D.N.Y. Aug. 27, 2003); Geritrex Corp. v. Dermarite Indus., LLC, 910 F. Supp. 955, 966 (S.D.N.Y. 1996) (declining to enjoin competitor's sale of personal hygiene products because, among other reasons, any potential lost sales to plaintiff could be determined by comparing the customer lists and sales information of the parties).  However, where an employee with unique client relationships violates a non-compete clause, injunctive is

ordinarily appropriate because "[i]f the unique services of such employee are available to a competitor, the employer obviously suffers irreparable harm." Ticor, 173 F.3d at 70.

Here, the evidence reviewed by the Court establishes that defendants' actions threaten to cause JCI irreparable harm by luring away the business of a number of long-term JCI clients. In their respective positions at JCI, and, prior to the acquisition, at APT, Neville and Moon were placed in positions that enabled them to maintain and develop significant and unique relationships with JCI's customers. The majority of these customers are repeat users of JCI's services who would likely seek JCI's services in the future, but for the competitive efforts of Neville and Moon. Once lost to Neville and Moon, there is little guarantee that, should JCI ultimately prevail in this action, these clients would return to JCI. Furthermore, to the extent the purpose behind the non-compete clauses is to allow JCI a brief period to transfer the client relationships maintained through Neville and Moon to their replacements, that benefit is inexorably lost by the failure to enforce the clauses immediately. What is at stake, then, for JCI is not only the indeterminate future billings that these clients would generate, but also the significant good will built up during JCI's *and* APT's long-term service of these clients. Moreover, because defendants acknowledge soliciting and providing competitive services to these clients since leaving JCI, it is clear JCI faces irreparable harm in this regard, absent injunctive relief.

Irreparable harm to an employer may also result where an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences. FMC Corp. v. Taiwan Tainan Giant Indus. Co, 730 F.3d 61, 63 (2d Cir. 1984) ("[I]t is clear that the loss of trade secrets

cannot be measured in money damages."); Unisource, 196 F. Supp. 2d at 280; Webcraft

Technologies, Inc. v. McCaw, 674 F. Supp. 1039, 1044-48 (S.D.N.Y. 1987).  Indeed,

irreparable harm is presumed where a trade secret has been misappropriated, even in the

absence of an employment agreement.  Jay's Custom Stringing, Inc. v. Yu, No. 01 Civ.

1690 (WHP), 2001 WL 761067 at *8 (S.D.N.Y. July 6, 2001); Earthweb, Inc. v. Schlack,

71 F. Supp. 2d 299, 309-10 (S.D.N.Y. 1999).  Nevertheless, "an employee's 'knowledge

of the intricacies of [a former employer's] business operation' is not a protectable interest

sufficient to justify enjoining the employee 'from utilizing his knowledge and talents.'"

Production Resource Group, 2003 WL 22350939 at *7 (alterations in original, quoting

Reed, Roberts Assocs., Inc. v. Strauman, 40 N.Y.2d 303, 309, 353 N.E.2d 590, 594, 386

N.Y.S. 677, 680 (1976)).[2]  Nor does simply labeling information as "confidential" render

it protectable so that its loss results in irreparable harm.  See, e.g., AM Media Comm.

Group v. Kilgallen, 261 F. Supp. 2d 258, 262 (S.D.N.Y. 2003) (finding that former

employee's access to confidential client information did not inexorably lead to a finding

of irreparable harm to her former employer).

As discussed more thoroughly below, the Court finds that plaintiff has failed to

show that Neville and Moon likely possessed or misappropriated trade secrets or

protectable confidential information.  While defendants clearly had some knowledge of

plaintiff's pricing methods, clients and client preferences, it is not clear on the present

record that this information was distinct from the kind of general expertise that a

professional might accumulate over a number of years in an industry.  Accordingly,

---

[2] Both the parties, and the Court, agree that New York law governs the parties'
substantive rights relating to the enforcement of the employment agreements and the
defendants' fiduciary duties.

because plaintiff has not shown that defendants have used or disclosed, or will use or disclose, any protectable information, it cannot be said that irreparable harm to plaintiff is imminent in this regard.

**B.    Likelihood of Success on the Merits**

1. Enforceability of the Non-Compete Agreements

It is well established under New York law that "negative covenants restricting competition are enforceable only to the extent that they satisfy the overriding requirement of reasonableness." Reed, 40 N.Y.2d at 307, 353 N.E.2d at 592, 386 N.Y.S. at 679; Purchasing Assocs., Inc. v. Weitz, 13 N.Y.2d 267, 272, 196 N.E.2d 245, 247, 246 N.Y.S.2d 600, 603-04 (1963) ("Also enforceable is a covenant given by an employee that he will not compete with his employer when he quits his employ, and the general limitation of 'reasonableness' . . . applies equally to such a covenant."). Thus, a restrictive covenant between an employer and employee "will only be subject to specific enforcement to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." Reed, 40 N.Y.2d at 307, 353 N.E.2d at 593, 386 N.Y.S. at 679; see also BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388-89, 712 N.E.2d 1220, 1223, 690 N.Y.S.2d 854, 856-57 (1999).

In fashioning the forgoing analysis, New York courts have endeavored to balance public policy concerns relating to the benefits of competition and the unfettered flow of talent and ideas in our economy with employers' legitimate right to protect the fruits of their labor, see Webcraft, 674 F. Supp. at 1044; Reed, 40 N.Y.2d at 307-08, 353 N.E.2d at 593, 386 N.Y.S. at 679-80; Purchasing Assocs., 13 N.Y.2d at 272, 196 N.E.2d at 247,

246 N.Y.S.2d at 604, the idea being that the proper balancing of these factors will produce the most wealth and innovation—such as Professor Warren Johnson's electronic thermostat—for society. It is important to keep in mind, however, that on a less grand scale the interests to be balanced are those of the individual employer and employee. As presciently recognized by the Second Circuit:

> An employer will sometimes believe its clientele is a form of property that belongs to it and any new business a salesperson drums up is for its benefit because this is what the salesperson was hired and paid to do. The employee believes, to the contrary, that the duty to preserve customer relationships ceases when employment ends and the employee's freedom to use contacts he or she developed may not be impaired by restraints that inhibit competition and an employee's ability to earn a living.

Ticor, 173 F.3d at 69-70 (citing Harlan M. Blake, Employee Agreements Not To Compete, 73 Harv. L. Rev. 625, 654 (1960)). These competing concerns are properly resolved by the parties through their freedom to contract. Id. at 70. Thus, it is not the Court's province to determine the *best* way to balance the parties' interests. To the contrary, the Court's duty is merely to determine the extent to which the parties' agreement is *reasonable* under this analysis and to enforce it accordingly.

As an initial matter, defendants do not dispute that the non-compete provisions in Neville and Moon's respective employment agreements are reasonable in time and geographic scope. Defendants' concession is amply supported by applicable precedent. The one-year duration of the covenants is not unreasonably long under the circumstances and, given that defendants performed their services for JCI exclusively within New York and the adjoining states, the provisions apply only to a limited identifiable group of JCI's clients and potential clients in a reasonably limited area. Cf. Unisource, 196 F. Supp. 2d

14

at 277 (finding that a two year period was reasonable but that, to the extent the agreement applied to all areas serviced by employer throughout the country, it was unreasonable).

Even if a covenant not to compete is reasonable in time and geographic scope, however, enforcement will only be granted to the extent necessary to protect the employer's legitimate interests: that is, "(1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique." Ticor, 173 F.3d at 70 (citing Purchasing Assocs., 13 N.Y.2d at 272-73, 196 N.E.2d at 248, 246 N.Y.S.2d at 604). Furthermore, whether viewed conceptually as a type of special service, an offshoot from an employer's interest in safeguarding customer information, or as a distinct cognizable interest, it is now clear that under New York law an employer also has a legitimate interest in protecting client relationships developed by an employee at the employer's expense. See, Ticor, 173 F.3d at 70-71 (likening client relationships to special or unique services); BDO Siedman, 93 N.Y.2d at 391-92, 712 N.E.2d at 1224-25, 690 N.Y.S.2d at 858-59 (finding that an employer may have a legitimate interest in protecting client relationships independent from its interest in an employee's unique services); Purchasing Assocs., 13 N.Y.2d at 272, 196 N.E.2d at 248, 246 N.Y.S.2d at 604 (noting that a restrictive covenant is enforceable to the extent necessary to prevent an employee's "*solicitation of*, or disclosure of any information concerning, [the former employer's] customers"). As recently explained by the New York Court of Appeals,

> Protection of customer relationships the employee *acquired* in the course of employment may indeed be a legitimate interest. "The risk to the employer reaches a maximum in situations in which the employee must work closely with the client or customer over a long period of time,

15

especially when his services are a significant part of the total transaction." Then, the employee has been enabled to share in the goodwill of a client or customer which the employer's over-all efforts and expenditures created. The employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment.

BDO Siedman, 93 N.Y.2d at 391-92, 712 N.E.2d at 1224-25, 690 N.Y.S.2d at 859 (emphasis in original, quoting Blake, supra, at 647).

The testimony and affidavits before the Court establish that it is more than likely that defendants Neville and Moon were placed in unique positions vis-à-vis JCI's critical systems clients and that they developed significant relationships with these clients. In their respective positions, Neville and Moon became primary contacts for sales and service matters relating to these clients, including the preparation of business proposals, as well as the direction and supervision of JCI's service efforts for these clients. (E.g., Pervolarakas Aff. ¶¶ 17-18; Tr. at 36, 78-79; 108; 237-38, 282-83.) Indeed, Neville and Moon do not seriously contest that they possessed significant client relationships with JCI's clients, rather, they argue that many of these clients were established by Moon, independent of JCI's efforts, and should properly be regarded as Moon's *personal* clients.[3] Relying on the principal developed in BDO Siedman that an employer has no legitimate interest in preventing an employee from competing for the patronage of clients who came to the employer solely to avail themselves of the employee's services and only

---

[3] In their Opposition filed prior to the evidentiary hearing, defendants contend that Neville's client relationships were also with personal clients, however, they did not present any evidence at the hearing that would support this claim. Defendants appear to have abandoned this argument as it applies to Neville and, instead, focus on the terms of Neville's non-compete provision, which, as discussed below, allows Neville significant leeway in his post-JCI employment. In any event, the Court does not find any justification on the present record for finding that Neville's contacts were with personal clients.

16

as a result of the employee's own independent recruitment efforts, 93 N.Y.2d at 393, 712 N.E.2d at 1225, 690 N.Y.S.2d at 859, defendants argue that JCI may not prevent Moon from taking these clients to his new company.

        This argument fails for a number of reasons.  First, the evidence before the Court establishes that the majority, if not all, of the clients which Moon claims as his own were clients of JCI prior to Moon's employment at JCI, (e.g., Tr. at 236-37), and there is no compelling evidence that any clients who came to JCI during Moon's tenure were obtained through Moon's independent recruitment efforts.  Second, contrary to Moon's assertion that the client relationships in question were built up over his 20-plus years in the industry without any effort or expenditure by JCI, (Tr. at 208-09), the record shows that JCI's efforts were significant:  To the extent Moon developed relationships with clients while employed by APT, these relationships were financed and supported by APT, which paid Moon's salary and the salary of the other engineers that worked under him providing critical systems service.  (Tr. at 233-34.)  It is uncontested that in 2000, JCI paid over 4 million dollars to APT for APT's business, which included the good will and relationships with critical systems clients built up through APT's and its employees' efforts.  (Tr. at 157.)  Furthermore, after the purchase of APT, these clients moved to JCI; Moon moved to Europe.  Upon his return to New York and acceptance of employment with JCI, Moon was again placed in close contact with these clients and continued to develop client relationships; however, once again, his efforts were not exclusively his own, but were financed by JCI, which paid his salary and the salaries of the other engineers and managers who contributed to the overall relationship and good will that JCI enjoyed with its critical systems clients.  (Tr. at 236-38.)  Moon's client relationships,

therefore, are not the result of his own, independent efforts, nor does it appear that Moon was the sole reason clients chose JCI.

Thus, on the present record, the Court finds that JCI likely has a legitimate interest in protecting its client relationships and goodwill so that the restrictive covenants in Neville and Moon's employment agreements are enforceable to the extent necessary to protect that interest. This is not to say that Moon, himself, brought nothing to the table in his employment with JCI. Clearly, Moon is a well-regarded expert in the critical systems field, especially with regard to the maintenance and testing of UPS systems. Defendants presented two witnesses who attested to Moon's knowledge and reputation with regard to these systems dating back to his pre-APT employment for a UPS manufacturer and, indeed, testified that they would seek out Moon to service their UPS equipment over any other engineer, no matter what company he worked for. (Tr. at 136-140, 142-43.) The Court, however, declines to read BDO Seidman's protection of employees' independent relationships so broadly as to find that Moon's unique reputation with UPS systems constitutes an independent relationship, distinct from the larger client relationship financed and maintained, in large part, through JCI's efforts.

Defendants appear to be on firmer ground with regard to their argument that enforcement of the non-compete agreements is not justified by the need to prevent Neville and Moon from misappropriating trade secrets or confidential information. Plaintiff contends that, while employed by JCI, Neville and Moon had access to a wide variety of trade secrets and confidential information including JCI's pricing strategies, the identities of JCI's customers and customer preferences. The Court finds, however, that defendants have raised significant questions as to whether Moon and Neville actually

possess any protectable information and, therefore, it is not clear on the present record that the need to protect such information provides an independent ground for enforcing the agreements.

"Courts applying New York law with respect to non-compete provisions will not presuppose that employees possess trade secrets or confidential information." SG Cowen Sec. Corp. v. Messih, No. 00 Civ. 3228 (HB), 2000 WL 6334343 (S.D.N.Y. May 17, 2000). Under New York law, "a trade secret is 'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it.'" Unisource, 196 F. Supp. 2d at 278 (alterations in original, quoting Softel, Inc. v. Dragon Med. & Scientific Communications, Inc., 118 F.3d 955, 968 (2d Cir. 1997)). In determining whether information constitutes a trade secret, New York courts consider the following factors:

> (1) the extent to which the information is known outside of the business;
> (2) the extent to which it is known by employees and others involved in
> the business; (3) the extent of measures taken by the business to guard the
> secrecy of the information; (4) the value of the information to the business
> and its competitors; (5) the amount of effort or money expended by the
> business in developing the information; and (6) the ease or difficulty with
> which the information could be properly acquired or duplicated by others.

Id. (citing North Atlantic Instruments v. Haber, 188 F.3d 38, 44 (2d Cir. 1999)). Under certain circumstances, specific marketing plans and price information, see, e.g., Earthweb, 71 F. Supp. 2d at 314; Webcraft, 674 F. Supp. at 1046-47, customer lists and the identity of client contacts, see, e.g., FMC Corp., 730 F.2d at 63; Unisource, 196 F. Supp. 2d at 278; Webcraft, 674 F. Supp. at 1044-46, as well as customer preferences and needs, see, e.g., Jay's Custom Stringing, 2001 WL 761067 at *6; Unisource, 196 F. Supp.

2d at 278, may be accorded trade secret protection.  Furthermore, "even where the information would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents, including detailed customer information by an employee for use in his future business or employment is to be enjoined as unfair competition."  Computer Assocs. Int'l, Inc. v. Bryan, 784 F. Supp. 982, 988 (E.D.N.Y. 1992).

On the other hand, as noted earlier, an employee's "knowledge of the intricacies of [his former employer's] business operation" is not a protectable interest sufficient to justify the enforcement of a restrictive covenant.  Reed, 40 N.Y.2d at 309, 386 N.Y.S.2d 680, 353 N.E.2d at 594.  Similarly, "[m]atters of public or general knowledge in an industry are incapable of being designated as a 'trade secret,'" Computer Assocs., 784 F.Supp. at 988, and "trade secret protection will not attach to customer information that can easily be recalled or obtained from the customers themselves." Jay's Custom Stringing, 2001 WL 761067 at *6; see also Earthweb, 71 F. Supp. 2d at 315 ("[I]t is well established that 'an employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential.").  Thus, absent the physical removal of actual contracts or client lists, it is difficult to show the misappropriation of these types of trade secrets or confidential information.  See Earthweb, 71 F. Supp. 2d at 315.

With regard to JCI's pricing method, testimony at the hearing established that the basic pricing structure for bids in the critical systems industry is based on published rates for various engineers and technicians, multiplied by time, plus materials.  An amount is then added or subtracted for each bid based on factors such as competition or the value of

the project to the client.  (Tr. at 153-57, 222-23.)  JCI clearly views its method for

determining this pricing adjustment to be proprietary and has taken steps, most notably

the requirement that employees sign confidentiality agreements, to make sure it remains

confidential.  Furthermore, at least during the brief time period in which different firms

are putting in price bids on a specific project, this pricing information is sensitive and,

potentially, valuable.  Nevertheless, it appears that any information Neville and Moon

now posses with regard to past JCI pricing proposals is now stale and, in any event,

already available to JCI's competitors.  (Tr. 152.)  In addition, it is not clear to the Court

that the determination of the price adjustment for each project is based on a discernable

method or formula.  Indeed, on the present record, it appears possible that this

determination is nothing more than a judgment call based on general experience in the

critical systems industry.

 Likewise, there are substantial questions as to whether the identities of JCI's

clients, their contact information or their customer preferences are protectable.  It appears

that JCI's clients are well known in the industry as potential consumers of critical

systems services.  (Tr. at 62, 152, 220.)  Furthermore, plaintiff has produced little

evidence as to the specific client preferences that it claims defendants have stolen, thus is

not clear that these preferences are distinguishable from the type of knowledge that any

critical systems professional might pick up over a number of years in the industry.  Nor is

there any evidence that defendants purloined physical customer lists or documents that

include sensitive customer information.  Accordingly, the Court finds there are

substantial questions as to whether the protection of trade secrets or confidential

information is an appropriate basis for enforcing the non-compete agreements in this action.[4]

Finally, the Court notes that the record clearly establishes that the agreements in question are not harmful to the general public or unreasonably burdensome to the defendants. Both Neville and Moon apparently had competing job offers upon leaving JCI, and there appear to be hundreds of clients in the tri-state area that require critical systems services. Likewise, there appear to be a number of firms, including JCI, that perform these services, such that the Court is not concerned that New York's financial markets will be impaired if defendants are prevented from servicing JCI's clients.

### 2. Interpretation of the Non-Compete Agreements

Even if the non-compete provisions are enforceable, defendants argue, based on a strained interpretation of the provisions, that their activities since leaving JCI do not violate their agreements. With regard to Moon's agreement, defendants focus on the last sentence of the non-compete provision, which states, "This covenant not to unfairly compete will not apply to contractors or subcontractors with whom Johnson Controls has existing or proposed business." Defendants interpret this language to permit Moon to provide services to any client of JCI as long as those services are provided through a

---

[4] To the extent plaintiff's rely on defendants' duty, independent from their employment agreements, not to disclose protectable information, the result is the same: there are substantial questions going to the merits of this claim. Furthermore, the Court notes that plaintiff has requested injunctive relief enjoining defendants from breaching their fiduciary duties and interfering with plaintiff's client relationships. Insofar as those requests relate to plaintiff's allegations of tortious interference and breach of fiduciary duty by defendants, plaintiff has offered little argument in its moving papers or during the evidentiary hearing to justify such relief and the Court finds that the proof of defendants' behavior in this regard is sufficiently obscure on the present record that preliminary injunctive relief is inappropriate on these ground. Insofar as these requests relate to plaintiff's breach of contract allegations, as discussed below, the Court finds that such relief is not necessary to protect plaintiff's legitimate business interests.

contractor or subcontractor.  Defendants contend that the managing agents employed by

many of JCI's clients are contractor or subcontractors that defendants may service and

that, because many of JCI's clients employ such managing agents, the agreement is so

limited as to be "meaningless."

Defendants interpret the last sentence in Neville's agreement, which states that the

covenant will not apply "in the event that any prospective employer whose business is

competitive with Johnson Controls has an existing revenue generating relationship with a

Johnson Controls customer or potential customer," to allow Neville to provide services to

*any* JCI customer or potential customer as long as his prospective employer has at least

*one* preexisting client that is also a customer or potential customer of JCI.  Defendants

contend that Moon started Critical Systems, Inc. the day after he left JCI and immediately

began servicing at least one former JCI client.  They further assert that Neville began to

work with Moon and Critical Systems, Inc. a few days later, after Critical Systems, Inc.

had established a revenue generating relationship with at least one former JCI client.

Therefore, they contend, Neville may now service any of JCI's clients or potential clients

through Critical Systems, Inc.

Putting aside the dubious nature of defendants' explanation of the timing relating

to Critical Systems, Inc.'s formation and Neville's involvement in the company, these

arguments fail to advance defendants' cause.  "It is axiomatic that a contract is to be

interpreted so as to give effect to the intention of the parties as expressed in the

unequivocal language employed.  Obviously, before the rules governing the construction

of ambiguous contracts are triggered, the court must first find ambiguity in the

[contract]."  Breed v. Ins. Co. of North America, 46 N.Y.2d 351, 355, 385 N.E.2d 1280,

1282, 413 N.Y.S.2d 352, 355 (1978) (citations omitted).  Contractual language is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion."  Id.  "Interpretation of an unambiguous contract provision is a function for the court, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument."  Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56, 396 N.E.2d 1029, 1032, 421 N.Y.S.2d 556, 559 (1979).

Here, Moon and Neville's non-compete agreements, read as a whole, are unambiguous.  With regard to Moon's agreement, it is clear that the words "contractors and subcontractors" refer to contractors and subcontractors that are hired by JCI, not contractors and subcontractors hired by JCI's clients.  Furthermore, the Court finds there is no reasonable basis to conclude otherwise.  "The fact that plaintiff offers a different interpretation for this clear provision does not render it ambiguous so as to warrant a trial. The task of the court is to enforce the plain meaning of an unambiguous agreement rather than to accept a construction that would render a purposeful provision of the contract meaningless."  Bluebird Partners, L.P. v. First Fidelity Bank, N.A., New Jersey, 248 A.D.2d 219, 224, 671 N.Y.S.2d 7, 12 (1st Dept. 1998).

Similarly, read as a whole, Neville's non-compete provision clearly prohibits him from servicing clients or potential clients whom he has serviced or solicited while at JCI. The restriction does not apply, however, where Neville's prospective employer already does business with one of JCI's clients or potential clients.  There is no reasonable basis, however, for interpreting the language in Neville's non-competition clause to allow him

24

to provide services to any JCI client or potential client provided he accepts employment with a company that has at least one preexisting relationship with a JCI client or potential client.[5]

## C.    Balance of the Hardships

Plaintiff, having established irreparable harm absent injunctive relief and that it is likely to succeed in its efforts to enforce the terms of the non-compete agreements insofar as they protect its legitimate interest in its client relationships, is entitled to limited injunctive relief.  The terms of the non-compete provisions that relate to existing JCI clients serviced or solicited by Neville and Moon or their subordinates will therefore be enforced through a preliminary injunction: defendants will be enjoined from directly or indirectly serving those existing JCI clients that were serviced or solicited by Neville and Moon, or employees under their supervision, while employed by JCI.

The protection of client relationships, however, does not justify enforcement of the portions of the non-compete clauses relating to *potential* clients of JCI who were merely *solicited* at the direction of Moon and Neville.  That is, those clients to whom Neville or Moon may have sent business proposals, but who never selected JCI to provide actual services.  JCI has no significant or special relationship with these potential clients to protect.  Rather, the restrictions relating to potential clients, as well as the restrictions in defendants' confidentiality agreements, must be justified by the need to protect trade secrets and confidential information.  As discussed above, on the present

---

[5] It bears noting that, even if the Court were to adopt defendant's far-fetched interpretation of Neville's non-competition clause, Moon's service of JCI clients in violation of his non-compete agreement prior to Neville's association with Critical Systems, Inc. would not provide a legitimate basis for Neville's subsequent service of JCI clients at Critical Systems, Inc.

record, plaintiff has failed to establish the likelihood that defendants have misappropriated protectable information or that irreparable harm will result from such conduct in this case. Accordingly, preliminary injunctive relief enforcing these restrictions is unwarranted.

This result is consistent with New York court's practice of enforcing restrictive covenants only to the extent necessary to protect the employer's legitimate interests and, where necessary, granting only partial enforcement of overbroad employee restrictive covenants. BDO Siedman, 93 N.Y.2d at 394, 712 N.E.2d at 1226, 690 N.Y.S.2d at 860-61. Absent overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, partial enforcement, as opposed to invalidating the entire covenant, is justified. Id. There is no evidence of such overreaching by JCI, and the covenants, as drafted, are reasonable; therefore, the Court will grant limited enforcement.

Because limited injunctive relief is justified based on plaintiff's showing of irreparable harm and likelihood of success on the merits, it is not necessary to balance the hardships in this case. For the sake of completeness, however, it is worth noting that were the Court to grant the expansive injunctive relief requested by plaintiff, covering not only defendants' service of actual JCI clients but also defendants' service and solicitation of potential JCI customers merely solicited by defendants while they were at JCI, the balance of the equities would be a close question. On the one hand, JCI stands to loose valued customers and *potentially* sensitive information. Defendants, on the other hand, are a small company serving a limited market. Assuming JCI actively solicits those potential clients that are of significant value in the critical systems industry, precluding defendants from serving JCI's existing customers, as well as potential customers solicited

in the last nine months of defendants' employment would likely prevent defendants from serving any of the high value financial service customers seeking critical systems services.

Given the limited injunctive relief that the Court is granting, however, the balance of the hardships tips decidedly in favor of JCI. Weighed against JCI's loss of actual valuable customers, defendants merely lose the ability to service a limited number of clients who are clearly covered by their non-competition agreements. Furthermore, it is clear from defendants' own deposition and hearing testimony that there are hundreds of businesses in the tri-state area that are potential consumers of their services. Under the circumstances, the potential harm to defendants is limited.

### D. Security

Rule 65(c) provides in pertinent part:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. Pro. 65(c). "The purpose of requiring security prior to issuance of an injunction or a temporary restraining order is to guarantee payment of costs and damages incurred by a party who is wrongfully enjoined or restrained." Interlink Int'l Fin. Servs., Inc. v. Block, 145 F.Supp.2d 312, 314 (S.D.N.Y. 2001) (quoting 13 Moore's Federal Practice at 65-94.1 (3d. ed.1997)). Generally, the amount of the bond posted is the limit that a wrongfully restrained party may recover. See id. Thus, in determination of the amount of the bond, the court should attempt to limit the possibility that a restrained party that is ultimately successful on the merits is not able to obtain adequate relief. "The risk created by the rule limiting recovery to the amount of the bond is that an enjoined party

may be unable to obtain adequate redress." <u>Little Tor Auto Center v. Exxon Co. USA</u>,
822 F.Supp. 141, 144 (S.D.N.Y.1993); <u>see</u> <u>Blumenthal v. Merrill Lynch, Pierce, Fenner</u>
<u>& Smith, Inc.</u>, 910 F.2d 1049, 1056 (2d Cir. 1990) ("Plaintiffs are entitled to damages as
may be shown to have been proximately caused by the injunction, up to the amount of the
bond.") (citations omitted).

Nevertheless, district courts in the Second Circuit are vested with wide discretion
in determining the amount of the bond that the moving party must post. <u>See</u> <u>Doctor's</u>
<u>Assocs., Inc. v. Stuart</u>, 85 F.3d 975, 985 (2d Cir. 1996); <u>Ferguson v. Tabah</u>, 288 F.2d
665, 675 (2d Cir.1961). Indeed, in cases where the non-movant has not shown a
likelihood of harm, the district court may properly set no bond. <u>See</u> <u>Doctor's Assocs.</u>, 85
F.3d at 985; <u>Ferguson</u>, 228 F.2d at 675; <u>see also</u> <u>Pharmaceutical Soc'y of New York, Inc.</u>
<u>v. New York State Dep't of Social Servs.</u>, 50 F.3d 1168, 1174 (2d Cir. 1995) ("Although
[Rule 65(c)] speaks in mandatory terms, an exception to the bond requirement has been
crafted for, *inter alia*, cases involving the enforcement of 'public interests' arising out of
'comprehensive federal health and welfare statutes.'") (citations omitted).

Defendants have indicated to the Court that a preliminary injunction prohibiting
them from servicing those clients they serviced while at JCI for the remaining duration of
the non-compete provisions would cost them approximately $1,147,274 in revenue.
(Letter from Robert W. Ottinger, Esq. of June 16, 2004.) This projection is reasonably
based on their actual earnings in the three months in which they have competed with JCI.
As plaintiff points out, however, lost profit is a more accurate measure of the potential
loss to defendants. (Letter of Peter N. Wang, Esq. of June 17, 2004.) Plaintiff submits
that 30 percent profit is standard in the industry; given Neville and Moon's low overhead,

a $350,000 profit estimate for this period is reasonable.  Plaintiff also correctly points out

that with a little effort, Moon and Neville could likely find other customers to replace

JCI's clients.  Yet, even if such customers are found, it does not necessarily follow that,

absent an injunction, Critical Systems, Inc. would not be able to service JCI's clients as

well as any new clients it develops.  Therefore, the bond is set at $350,000.

## CONCLUSION

For the reasons stated, the temporary restraining order issued by this Court on

June 2, 2004 and thereafter extended on June 16, 2002 is dissolved; plaintiff's motion for

a preliminary injunction is granted in part and denied in part so that defendants are

hereby ENJOINED AND RESTRAINED for a one year period following their last day of

employment at JCI from directly or indirectly servicing existing JCI customers served or

solicited by defendants Neville and Moon, or by another JCI employee under their

supervision, during their employment with JCI, with the exception that if defendant

Neville accepts employment with an employer whose business is competitive with JCI

and who has an existing revenue generating relationship with a JCI customer, defendant

Neville may service that customer.  The issuance of this preliminary injunction is

conditioned upon plaintiff JCI posting a bond in the amount of $350,000 by 5:00 p.m.

June 28, 2004.  The parties are further ordered to appear before the Court on July 22,

2004 at 11:30 a.m. for a pre-trial conference.

**SO ORDERED.**

New York, New York
June **24**, 2004

U.S.D.J.

29